JUDGE SULLIVAN   (S)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Richard Arjun Kaul
120 Temple Terrace
Palisades Park
New Jersey 07650
201 592 0038
drrichardkaul@gmail.com

16 CV 1346

**RICHARD ARJUN KAUL, M.D.- PROPRIA PERSONA**

**Plaintiff**

**V**

**CHRISTOPHER J.CHRISTIE, ESQ; THE STATE OF NEW JEREY; JEFFREY CHIESA, ESQ; LEWIS STEIN, ESQ; HOWARD SOLOMON, ESQ; ALLSTATE NEW JERSEY INSURANCE COMPANY; RICHARD CRIST; GOVERNMENT EMPLOYEES INSURANCE CO; GEICO INDEMNITY; GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY; BERKSHIRE HATHAWAY: WARREN BUFFET: TD BANK; DIVESH KOTHARI; RUTGERS SCHOOL OF BIOMEDICAL AND HEALTH SCIENCES; JAMES GONZALEZ; ROBERT HEARY, MD; STEVEN LOMAZOW, MD; GREGORY PRZYBYLSKI, MD; FRANK MOORE, MD; PETER CARMEL, MD; WILLIAM MITCHELL,MD; PETER STAATS,MD; MARC COHEN,MD; THE LAW FIRM OF SCARINCI AND HOLLENBECK; KENNETH HOLLENBECK, ESQ; THE LAW FIRM OF BRACH EICHLER; JOSEPH GORRELL, ESQ; THE NORTH AMERICAN SPINE SOCIETY; THE AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS; THE CONGRESS OF NEUROLOGICAL SURGEONS; CHRISTOPHER WOLFA, MD; THE AMERICAN MEDICAL ASSOCIATION;THE LAW FIRM OF DUGHI HEWIT; MICHAEL KEATING; ANDREW KAUFMAN,MD; THE NEW JERSEY BOARD OF MEDICAL EXAMINERS; WILLIAM ROEDER; NORTH JERSEY MEDIA; LINDY WASHBURN; HACKENSACK UNIVERSITY MEDICAL CENTER (HUMC); ROBERT GARRET; ATLANTIC HEALTH SYSTEM; BRIAN GRAGNOLATI;THOMAS PETERSON, MD;JOHN ROE 1-50, JOHN DOE 1-50, ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50**

**Defendants**

**COMPLAINT**

**Plaintiff demands a trial by jury.**

---

Plaintiff, Richard Kaul, MD, who had a residence when this cause of action accrued of 69 West 83rd Street, New York, New York, to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, for his Verified Complaint (hereinafter "Complaint") asserts the following against Defendants.

## LEGAL DEFINITIONS OF RELEVANT FEDERAL STATUTES

### RICO-18 U.S. Code § 1961-

1. "Racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1592 (relating to peonage, slavery, and trafficking in persons).,[1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate

transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), sections 175–178 (relating to biological weapons), sections 229–229F (**relating to chemical weapons**), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B); (2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;(6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

(7) "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

(8) "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;(9) "documentary material" includes any book, paper, document, record, recording, or other material; and(10) "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

## SHERMAN AND CLAYTON ANTI-TRUST ACTS-15 U.S. Code § 2

2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## THE HOBBS ACT-18 U.S. Code § 1951

3. (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.(b) As used in this section— (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction. (c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.

## MAIL FRAUD-18 U.S. Code § 1343

4. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## WIRE FRAUD-18 U.S. Code § 1341

5. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or

paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

### HONEST SERVICES FRAUD-18 U.S. Code § 1346

6. For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

### FOREIGN CORRUPT PRACTICES ACT-15 U.S. Code § 78dd-1

7. (a) ProhibitionIt shall be unlawful for any issuer which has a class of securities registered pursuant to section 78l of this title or which is required to file reports under section 78o (d) of this title, or for any officer, director, employee, or agent of such issuer or any stockholder thereof acting on behalf of such issuer, to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—(1) any foreign official for purposes of—(A)(i) influencing any act or decision of such foreign official in his official capacity,(ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or(iii) securing any improper advantage; or(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person;(2) any foreign political party or official thereof or any candidate for foreign political office for purposes of—(A)(i) influencing any act or decision of such party, official, or candidate in its or his official capacity,(ii) inducing such party, official, or candidate to do or omit to do an act in violation of the lawful duty of such party, official, orcandidate, or(iii) securing any improper advantage; or(B) inducing such party, official, or candidate to use its or his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person; or(3) any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office, for purposes of—(A)(i) influencing any act or decision of such foreign official, political party, party official, or candidate in his or its official capacity, (ii)

inducing such foreign official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official, or candidate, or(iii) securing any improper advantage; or(B) inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person.

## DEFAMATION-28 U.S. Code § 4101-

8. The term "defamation" means any action or other proceeding for defamation, libel, slander, or similar claim alleging that forms of speech are false, have caused damage to reputation or emotional distress, have presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person.

## DEPRIVATION OF RIGHTS UNDER COLOR OF LAW-42 U.S.C. § 1983

9. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

10. This law makes it illegal to discriminate against someone on the basis of race, color, religion, national origin, or sex. The law also makes it illegal to retaliate against a person because the person complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit. The law also requires that employers reasonably accommodate applicants' and employees' sincerely held religious practices, unless doing so would impose an undue hardship on the operation of the employer's business.

## <u>PARTIES</u>

11. Plaintiff, RICHARD ARJUN KAUL, MD, was a resident of the State of New York when this cause of action accrued and was formerly a Medical Doctor licensed to practice medicine in the State of New

Jersey. Kaul's residence when this cause of action accrued was 69 West 83rd Street, New York, New York.

12. Defendant, CHRISTOPHER CHRISTIE, ESQ, is the governor of the State of New Jersey and head of the Executive Branch of the government, which includes the Board of Medical Examiners.

13. Defendant, THE STATE OF NEW JERSEY, is one of the fifty American states and is located in the northeastern region of the country. The governor since 2009 has been is defendant, Christopher J. Christie. All three branches of the state government have liability in this matter but the executive is most culpable for the crimes alleged and is under direct control of defendant Christie.

14. Defendant, JEFFREY CHIESA, ESQ., was the Attorney General of the State of New Jersey when the acts complained of occurred and a high level representative of the Executive Branch of the government, which includes the Board of Medical Examiners.

15. Defendant, LEWIS STEIN, ESQ, is a New Jersey attorney with a Morris County based law practice whose focus is medical malpractice. He represented patient James Jarrell in Jarrell v Kaul, lost his appeal at The New Jersey Supreme Court in September 2015 and has knowledge about Middle Eastern arms dealer, Boruch Freedman.

16. Defendant, ALLSTATE NEW JERSEY INSURANCE COMPANY, is the New Jersey subsidiary of Allstate. Its CEO is Richard Crist. Allstate is one of the largest providers of auto insurance in New Jersey, which has the highest rates in the country. New Jersey is also its most profitable market.

17. Defendant, RICHARD CRIST, is the CEO of Allstate New Jersey Insurance Company, whose annual compensation package is in excess of $10 million. Crist is a graduate of a college in Pennsylvania called Muhlenberg.

18. Defendants, GOVERNMENT EMPLOYEES INSURANCE CO, GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY are the second largest provider of auto insurance in New Jersey and are owned by corporate defendant, BERKSHIRE HATHAWAY whose CEO is defendant, WARREN BUFFET.

19. Defendant, TD BANK, NA, is a United States national bank chartered and supervised by the federal Office of the Comptroller of the Currency. The company is a subsidiary of the Canadian Toronto-Dominion Bank based in Toronto, Ontario. In 2008 it purchased New Jersey Commerce Bank and centralized its national headquarters in Cherry Hill, New Jersey, USA.

20. Defendant, ATLANTIC HEALTH SYSTEM, is private healthcare company whose headquarters are Morristown, New Jersey. It is the parent company for Morristown Memorial Hospital, Overlook

Hospital, Chilton Memorial Hospital and Hackettstown Hospital. It's business covers Morris, Sussex and Passaic counties. Defendants, COHEN, HEARY, CARMEL, LOMAZOW and KAUFMAN take their private patients to AHS hospitals.

21. Defendant, RUTGERS SCHOOL OF BIOMEDICAL AND HEALTH SCIENCES, was formerly The University of Medicine and Dentistry of New Jersey (UMDNJ) which was the state-run health sciences institution for New Jersey. It is the professional and physical location at which defendants, HEARY, CARMEL and KAUFMAN practice medicine and some of the premises of which they committed the crimes.

22. Defendant, HACKENSACK UNIVERSITY MEDICAL CENTER (HUMC), is 900 bed private hospital seven miles west of New York City. Defendant neurosurgeons, PETERSON and HEARY, bring their private cases to HUMC and is one of the locations at which they committed the crimes.

23. Defendant, DR. ROBERT HEARY, is an individual residing at 68 Blackburn Road, Summit, Union County, New Jersey 07901 who is the Director of the Neurological Institute of the New Jersey Spine Center and Neurosurgical Intensive Care Unit located in Newark, Essex County, New Jersey. The latter is part of defendant Rutgers. The defendant is also an attending at HUMC and Overlook Hospital in Summit, New Jersey which is part of Atlantic Health System.

24. Defendant, DR.STEVEN LOMAZOW, is a neurologist who was also a senior member of defendant, NJBME, in 2012. He voted against the May 9th 2012 interim consent order that allowed Dr. Kaul to perform interventional spine procedures. Lomazow has business interests with defendants Allstate and Geico through family members. Lomazow is part of the Atlantic Neuroscience Institute at Overlook Hospital with defendants Heary, Carmel and Kaufman.

25. Defendant, DR.GREGORY PRZYBYLSKI, is an individual residing at 28 Quail Run, Warren, Somerset County, New Jersey. Dr. Przybylski is the director of neurosurgery at the New Jersey Neuroscience Institute at JFK Medical Center located in Edison, Middlesex County, New Jersey. He was also the 2011 President of defendant NASS and a member of defendant CNS along with defendants Heary, Carmel, Mitchell, Moore and Peterson. **(Exhibit 1)**

26. Defendant,DR. FRANK MOORE, is an individual residing at 650 Park Avenue, Apartment 21C, New York, New York, 10065. He is a clinical professor of neurosurgery at Mount Sinai School of Medicine located in New York, New York. Dr. Moore also has a practice located at 309 Engle Street, Suite 6, City of Englewood, Bergen County, New Jersey. He

27. Defendant, DR.PETER CARMEL, is an individual residing at 90 Bergen Street, Newark, Essex County, New Jersey. Dr. Carmel is a Co-Director of Neurosurgery at the Neurological Institute of New Jersey located in Newark, Essex County, New Jersey.

28. Defendant, AMERICAN MEDICAL ASSOCIATION (AMA), is a professional medical association located at AMA Plaza, 330 N. Wabash Avenue, Chicago, Illinois 60611-5885. Defendant, CARMEL, was the 2011 president.

29. Defendant, DR.WILLIAM MITCHELL is an individual residing at 895 Wood Avenue, Edison, Middlesex County, New Jersey. Dr. Mitchell is an attending neurosurgeon at JFK Medical Center located in Edison, Middlesex County, New Jersey.

30. Defendant, THOMAS PETERSON, is an individual with a business address at 140 Prospect Avenue, Suite 18, Hackensack, New Jersey 07601. He is a neurosurgeon who performs his private medical work at defendant, HUMC.

31. Defendant, DR.PETER STAATS, is an individual with a medical office at 160 Avenue at The Commons #1, Shrewsbury, New Jersey 07702. He is a the President of defendant ASIPP and editor of Pain Medicine News.

32. Defendant, DR.MARC COHEN, is an individual with a medical office at 221 Madison Avenue, Morristown, New Jersey 07960. He is a member of defendant, NASS, and works at Morristown Memorial Hospital which is part of defendant, AHS.

33. Defendant, SCARINCI AND HOLLENBECK, is a New Jersey law firm of which defendant, KENNETH HOLLENBECK,ESQ, is a founding partner. The firm is located at 1100 Valley Brook Avenue, Lyndhurst, New Jersey 07071-0790

34. Defendant, KENNETH HOLLENBECK, ESQ, is an individual with a business address at 1100 Valley Brook Avenue, Lyndhurst, New Jersey 07071-0790. He belongs to the New Jersey Republican Party.

35. Defendant, BRACH EICHLER, is a New Jersey law firm of which defendant, JOSEPH GORRELL,ESQ, is a senior partner. The firm is located at 101 Eisenhower Parkway, Roseland, New Jersey 07068.

36. Defendant, JOSPEH GORRELL, ESQ, is an individual with a business address at 101 Eisenhower Parkway, Roseland, New Jersey 07068.

37. Defendant, THE NORTH AMERICAN SPINE SOCIETY, is a global medical society of which defendant, DR.GREGORY PRZYBYLSKI, was the 2011 President..

38. Defendant, THE AMERICAN SOCIETY OF INTERVENTIONAL PAIN, is a professional medical society with a business address at 2831 Lone Oak Road, Paducah, Kentucky, 42003. Defendant, DR.PETER STAATS, is the President.

39. Defendant, CNS, is a professional medical society with a business address located at 725 Fifteenth Street, NW, Suite 500, Washington, DC 20005. Defendants, HEARY, PRZYBYLSKI, CARMEL, MITCHELL, MOORE and PETERSON are members.

40. Defendant, CHRISTOPHER WOLFA, is an individual located at 725 Fifteenth Street, NW, Suite 500, Washington, DC 20005. He is the Chairman of the Professional Conduct Committee for defendant, CNS.

41. Defendant, MICHAEL KEATING, ESQ, is an individual with a business located at 340 N Avenue E #2, Cranford, New Jersey 07016. He is a senior partner of the law firm at which defendant, CHRISTIE, worked before he was appointed the US Attorney for New Jersey in 2000.

42. Defendant, DUGHI HEWIT, is a New Jersey law firm with a business located at 340 N Avenue E #2, Cranford, New Jersey 07016.

43. Defendant, DR. ANDREW KAUFMAN, is an individual with a business located at 90 Bergen Street #3400, Newark, New Jersey 07103. He office is in the same building as defendants, HEARY and CARMEL.

44. Defendant, NJBME, is the state licensing board for physicians. It is located at 140 E Front Street, Trenton, New Jersey 08608. It is a subdivision of the Executive Branch of government.

45. Defendant, WILLIAM ROEDER, is the executive director of defendant, NJBME. His address is 140 E Front Street, Trenton, New Jersey 08608.

46. Defendant, LINDY WASHBURN, is an individual located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. She works as a journalist for defendant, NORTH JERSEY MEDIA.

47. Defendant, NORTH JERSEY MEDIA, is a corporation located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. It publishes The Bergen Record newspaper.

48. Defendant, JAMES GONZALEZ, is an individual located at 150 Bergen Street, Newark, New Jersey 07103. He is the president of Rutger's University Hospital.

49. Defendant, DIVESH KOTHARI, is the Vice-President of TD Bank, N.A. He is located at 1701 Route 70 East, Cherry Hill, New Jersey 08034.

50. Defendant, ROBERT GARRETT, is an individual located at 30 Prospect Avenue, Hackensack, New Jersey 07601. He is the president of defendant, HUMC.

51. Defendant, BRIAN GRAGNOLATI, is an individual located at 100 Madison Avenue, Morristown, New Jersey 07960. He is the president of defendant, AHS.

52. Defendant, BERKSHIRE HATHAWAY INC, is an American multinational conglomerate holding company headquartered in Kiewit Plaza, Omaha, Nebraska. It is the parent company of defendant, GEICO.

53. Defendant, WARREN BUFFET, is an American businessman located in Nebraska, Omaha. He is the Chairman and CEO of defendants, BERKSHIRE HATHAWAY and GEICO.

54. Defendants, JOHN ROE 1-50, and JOHN DOE 1-50 are as yet unidentified individuals who have assisted the named defendants in the commission of their crimes.

55. Defendants, ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50 are as yet unidentified corporations that have assisted the named Defendants in the commission of their crimes.

## JURISDICTION AND VENUE

56. Plaintiff asserts subject matter jurisdiction for his claims as arising under a federal statute providing federal question jurisdiction (28 U.S.C. § 1331 (federal question jurisdiction)) as well as diversity of citizenship jurisdiction as plaintiff resided in the State of New York when these causes of action accrued and Defendants resided in the State of New Jersey and the matter alleges damages in excess of $75,000.

57. Venue is appropriate in this District for Plaintiffs' claims under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (i) plaintiff when the cause of action accrued resided in the State of New York and Defendants directed their actions against Plaintiff a New York citizen.

## OVERVIEW OF PLAINTIFFS' LEGAL CLAIMS

58. Defendants' commission of the crimes of wire fraud and mail fraud are the predicate acts that constitute the definition of a Racketeering Enterprise under the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO) (18 USC 1961, et seq.).

59. RICO, as enacted, constitutes a potent weapon against enterprise liability. RICO's civil law provisions (hereinafter "civil RICO") provide injured plaintiffs with the incentive to sue by providing a treble damage award plus attorneys' fees. As does antitrust litigation, civil RICO suits enable private party enforcement of criminal statutes.

60. With deterrence in mind, RICO includes a provision allowing private parties to bring a civil suit for treble damages. The plaintiff must overcome two pleading burdens to state a claim for damages under RICO.

61. First, the plaintiff must allege that the defendant has violated the substantive RICO statute, commonly known as "criminal RICO." In so doing, the plaintiff must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

62. Second, the plaintiff must allege that he was injured in his business or property by reason of a violation of section 1962.

63. Plaintiff submits that he can meet all of the requirements to establish a violation of Section 1962 of the Federal RICO Act and, thus, is entitled to an award of treble damages, attorney's fees and costs.

## PRELIMINARY STATEMENT

65. Dr.Richard Arjun Kaul is a minimally invasive spine physician who graduated in 1988 from the Royal Free Hospital School of Medicine in London after which he commenced eight years of post graduate training in both the US and the UK in the fields of general surgery, anesthesiology and

interventional pain. **(Exhibit 1)**

66. From 2001 to 2012, while practicing in the US, he performed 800 minimally invasive spine procedures and 6000 interventional spine procedures with no deaths, no life threatening complications and good to very good outcomes in 95% of cases. **(Exhibit 2)**

67. During his entire career he performed 10,000 anesthetic cases  *interventional spine procedures*

68. In 2005 he performed the first outpatient lumbar spinal fusion at The Market Surgical Center, Saddlebrook, New Jersey.

69. He brings this case against a powerful combination of New Jersey physicians, lawyers, healthcare systems, insurance companies and a 2016 US Presidential candidate. The central thrust of this case originates in the collusion and conspiracy of the named defendants to destroy Dr. Kaul's reputation and global business interests as a consequence of the financial threat his successful practice presented to their own commercial interests.

70. The defendants conducted themselves in a corrupt manner with the exchange of bribes, political favors and a perversion of the legislative process to further their own business agendas.

71. The wrongful conduct of the defendants resulted in unnecessary hardship and suffering to thousands of patients who Dr.Kaul would have been able to assist, both in the US and Africa, to local and national businesses who were associated with the work of Dr.Kaul and also to the family, professional life and global reputation of Dr.Kaul.

72. Through deviously manipulating the media the administration of Christopher J Christie attacked the impartiality of the legal process and in actuality also perverted the course of justice by altering court transcripts.

73. This case is about greed, political corruption and a dereliction of professional duty that has had harsh material consequences for both citizens of the US and Africa.

### FACTUAL BACKGROUND
### PERSONAL BACKGROUND

**1964-1983**

74. Dr.Richard Arjun Kaul was born on November 5th 1964 in Hyderabad, India. His father, a wing commander in the Indian Air Force, was a Kashmiri Brahman. His mother was Anglo-Indian and from Agra. He is a citizen of India, a permanent resident of the US and a British trained physician.

75. Aged two he emigrated to the Great Britain with his mother and three siblings in order to be with his mother's family. His father remained in India. Dr. Kaul lived with his grandparents in the working class town of Dartford, Kent where he attended the local nursery school. His mother took evening classes to obtain her secretarial certification.

76. Aged five he moved to Aden, South Yemen with his parents and younger sister as his father had been contracted to fly with a private airline in the newly formed country of South Yemen

77. Dr.Kaul returned to the UK in 1972 during the depths of one of the worst post-war recessions and as a consequence of the fact his father was unable to procure work as pilot in the UK which combined with a severe gambling problem caused the family lived in government housing and on welfare. To add to the challenges he encountered Dr.Kaul dealt with a deeply racist British culture that openly discriminated against Indians.

78. From1972-1975 Dr. Kaul attended St. Joseph's Roman Catholic Primary School in Crayford , Kent. At age eleven he took the 11+ examination ,the process through which children were filtered into either grammar or comprehensive schools. The top 0.1% of children in the country went to grammar school.

79. From October 1975-July 1983 Dr. Kaul attended St. Mary's Roman Catholic Grammar School for Boys in Sidcup, Kent where for seven consecutive years he won both the academic and sporting awards for his class. In 1981 he passed thirteen O-Level examinations in Biology, Physics, Chemistry, Latin, English Language, EnglishLiterature, Geography, History, Mathematics, Advanced Mathematics, Religious Studies, French and Art.

80. Based on the grades he obtained in his O-level exams the school recommended he be placed in the Oxbridge track to prepare him for the Oxbridge entrance examination. Dr. Kaul did not want to go up to Oxford or Cambridge and expressed a desire to study economics and philosophy at University. The compromise reached was that he would go to medical school to which he reluctantly agreed. He therefore took three A level subjects in Physics, Biology and Chemistry in which he obtained an two

As and one B in the national examination he took in 1983.

81. Dr. Kaul's parents separated when he was eleven. His mother died of cancer aged forty-three, when he was fourteen, allegedly due to the fact her GP incorrectly ascribed her symptoms to anxiety. She passed away at St. Thomas's Hospital in London on March 23rd 1979. His father's health deteriorated rapidly after his mother's death and he collapsed on the street and died two years later. He was never able to recover economically. Dr. Kaul continued to live in the council (the US equivalent is referred to as project housing) house in Dartford, Kent on his own and refused to comply with the social services that wanted to place him in a foster home. He was able to persuade them to allow him to live on his own and agreed to have a social worker check on his progress weekly. During this period he worked part-time stacking the freezer section of Sainsbury's Supermarket in Dartford in order to make some money. The school provided him with free lunches. **(Exhibit 2)**

82. From 1983-1988 Dr. Kaul attended the Royal Free Hospital School of Medicine in London. He graduated aged 23 in July 1988 with a Bachelor of Medicine and a Bachelor of Surgery (M.B, B.S).

## PROFESSIONAL BACKGROUND-PART ONE
## CURRICULUM VITAE
## 1988-2016
## EDUCATION:

83. 1983-1988:  The Royal Free Hospital School of Medicine, London University, London, England.

84. 1988-1989:  Surgical House Officer, Lister Hospital, Stevenage, Hertfordshire, England.

85. 1989-1989:  Medical House Officer, Academic Unit of Medicine, Royal Free Hospital, London, England.

86. 1989-1990:  Surgical Intern, Catholic Medical Center, Queens, New York.

87. 1990-1991:  Surgical Intern, Nassau County Medical Center, East Meadow, New York.

88. 1991-1992:  PGY-2 Surgery Resident, Booth Memorial Medical Center, Queens, New York.

89. 1992-1995:   Anesthesiology Residency, Albert Einstein- Montefiore Medical Center, Bronx, New York.

90. 1995-1996:   Pain Fellowship, Department of Anesthetics, Bristol Royal Infirmary, Bristol, United Kingdom

**PROFESSIONAL APPOINTMENTS:**

91. December 2008-Present-President, The Spine Africa Project

92. March 2007 – June 2012:  Private Practitioner, New Jersey Spine & Rehabilitation, Pompton Lakes, New Jersey.

93. April 2010 – February 2011:  Attending in Interventional Pain and Minimally Invasive Spine, North Jersey Surgery Center, Englewood Cliffs, New Jersey.

94. April 2007 – October 2010:  Director of Outpatient Spine Surgery, The Bergen Passaic Ambulatory Surgery Center, Clifton, New Jersey.

95. May 2007 – December 2007:  Attending in Interventional Pain and Minimally Invasive Spine, Pain & Surgery Ambulatory Center, Wyckoff, New Jersey.

96. November 2006 – March 2007:  Medical Director of The North Jersey Center for Surgery, Newton, New Jersey.

97. September 2004 – March 2007:  Medical Director of Market Street Surgical Center, Saddle Brook, New Jersey.

98. June 2004 – May 2007:  Attending in Interventional Pain and Minimally Invasive Spine, The North Jersey Center for Surgery, Newton, New Jersey.

99. June 2004 – March 2007:  Private Practitioner in Interventional Pain and Minimally Invasive Spine, Saddle Brook, New Jersey.

100. October 2002 – December 2003: Attending, Pain Management Center, St. Clare's Hospital, Denville and Dover, New Jersey.

101. February 2002 – August 2002:  Attending Anesthesiologist and Director of Pain Services, Columbus Hospital, Newark, New Jersey.

102. October 2001 – December 2001:  Attending Anesthesiologist, Hackensack University Medical Center, Hackensack, New Jersey.

103. January 1997 –February 2001:  Attending, The Regency Clinic, London, England. (Contact 27 Welbeck Street, London W1M 7PG, England

104. September 1996 – December 1996:  Attending in charge of pain clinic, Macclesfield General Hospital, Macclesfield, Chesire, England.

### CERTICATION/LICENSURE:

105. 2006 Member of The American Society of Interventional Pain Physicians.

106. 2004 Completion of visiting fellowship in Minimally Invasive Spine Surgery, Wooridul Spine Hospital, Seoul, Korea.

107. 2004 Member of The American Academy of Minimally Invasive Spinal Medicine and Surgery.

108. 2004 Diplomate of the American Board of Interventional Pain Management.

109. 1996 Diplomate of American Board of Anesthesiology.

110. 1996 Medical License, State of New Jersey: MA 63281.

111. 1993 F.L.E.X

112. 1989 E.C.F.M.G.

113. 1988 MB.BS (London University).

## CREDENTIALS AND CERTIFICATES: (Exhibit 3)

114. North American Spine Society – Evaluation & Treatment of Adult Spinal Deformity: Hands-On Course.  March 16 – 17, 2012.  Burr Ridge, IL. Certificate of Participation.

115. Beckers ASC 18th Annual Ambulatory Surgery Centers Conference.  Improving Profitability and Business and Legal Issues.  Featured Speaker:  Orthopedics and Spine in ASC's – Key Trends and Ideas.  October 28, 2011.  Chicago, IL.

116. The Philipinno-American Medical Conference – The Future of Outpatient Spine Surgery.  Featured
Speaker.  September 24, 2011.  Atlantic City, NJ.

117. AOSpine Live Tissue Training – The Prevention and Management of Complications in Spine Access Surgery.  September 17, 2011. Strasbourg, France.  Certificate of Participation and Completion.

118. SI-Bone – iFuse Implant System Surgeon Training Program. May 21, 2011. Jamesburg, NJ. Certificate of Completion.

119. LDR – Anterior Stand-alone Clinical Solutions utilizing VerteBRIDGE Technology.  A hands-on cadaver skills lab.  May 13, 2011.  Las Vegas, NV.

120. The 3rd Annual ASC Review Seminar.  April 27, 2011.  Somerset, NJ.
Utilizing Urine Drug Screens Appropriately sponsored by Avee Laboratories.  March 15, 2011.  East Hanover, NJ.  Certificate of Attendance.

121. Spine Arthoplasty Society.  The Second Annual Meeting of the International Society for the Advancement of Spine Surgery – Middle East Chapter (SASME). February 3 – 5, 2011.  Movenpick Dead Sea, Jordan.

122. 20th Annual Dr. Tom Lowe Spine Symposium:  The Surgical Management of Spinal Disorders.  January 14 – 17, 2011.  Beaver Creek, CO.  Certificate of Participation.

123. Weill Cornell Medical College.  Indications and Controversies:  Minimally Invasive Spinal Surgery and Navigation.  Hands-on Symposium.  December 2 – 4, 2010.  New York, NY.  Certificate of Participation.

124. 2010 Annual Meeting of the Society for Minimally Invasive Spine Surgery.  November 5 – 7, 2010.  Miami, FL.  Certificate of Participation.

125. Informed - Cultural Competency Update for the Physician.  October 12, 2010.  Certificate of Completion.

126. X-Spine - Advances in Interspinous and Transfacet Fixation: A Hands-On Cadaver Course.  August 27, 2010.  Henderson, NV.

127. American Society of Interventional Pain Physicians Webinar – Urine Drug Screen Testing Compliance conducted on July 15, 2010.

128. Columbia University College of Physicians & Surgeons – 19th Annual Course & Symposium, Basic & Advanced Techniques in Electrodiagnostic Medicine.  June 16 – 17, 2010.  New York, NY.  Certificate of Participation.

129. Dubai Spine Masters:  Interventional and Pain Management Techniques.  May 26 – 27, 2010.  Dubai, UAE.  Certificate of Participation.

130. Dubai Spine Masters:  Minimally Invasive Surgical Strategies.  May 23 – 25, 2010.  Dubai, UAE.  Certificate of Participation.

131. 10th Annual Global Symposium on Motion Preservation Technology. April 27 – 30, 2010.  New Orleans, LA.  Certificate of Participation.

132. American Society of Interventional Pain Physicians Webinar – Evidence-Based Interventional Techniques: An Algorithmic Approach To Keeping It Simple, Safe and Successful conducted on March 30, 2010.  Certificate of Participation.

133. Spine Arthroplasty Society.  February 18, 2010.  Certificate of Membership.

134. North American Spine Society – 24th Annual Meeting.  November 11 – 14, 2009.  San Francisco, CA.  Certificate of Completion.

135. North American Spine Society – 24th Annual Meeting Technique Workshop: Interbody Fusion Technologies.  November 10, 2009.  San Francisco, CA.  Certificate of Completion.

136. 2009 Annual Meeting of the Society for Minimally Invasive Spine Surgery.  Oct. 9 – 12, 2009.  Las Vegas, NV.  Certificate of Participation.

137. North American Spine Society - Spine Across The Sea 2009.  July 26 – 30, 2009.  Maui, Hawaii. Certificate of Completion.

138. 21st Annual International Bethesda Spine Workshop: Thoraco-Lumbar Course.  April 19-20, 2009.  Certificate of Participation.

139. 13th Annual International Argospine Symposium.  January 29-30, 2009.  Paris, France. Certificate of Attendance.

140. SRH Klinikum Karlsbad-Langensteinbach gGmbH.  Akademisches Lehrkrankenhaus der Universität Heidelberg.  Guttmannstrasse 1,  76307 Karlsbad,  Germany.  January 26-28, 2009. Visiting doctor, rounds with Dr. Robert Melcher.

141. University of California, San Diego School of Medicine.  2008 Annual Meeting of the Society for Minimally Invasive Spine Surgery.  November 13-15, 2008.  Henderson, NV.  Physician Certificate of Credit.

142. North American Spine Society – 23rd Annual Meeting.  October 14-18, 2008.  Toronto, Canada. Certificate of Completion.

143. North American Spine Society – 23rd Annual Meeting Technique Workshop:  Interbody Fusion Technologies.  October 14, 2008.  Toronto, Canada.  Certificate of Completion.

144. Cleveland Clinic Foundation Center for Continuing Education – Spine Review – July 16-22, 2008. Cleveland, OH.  Certification of Participation.

145. Columbia University College of Physicians & Surgeons – Basic & Advanced Techniques in Electrodiagnostic Medicine.  June 11-12, 2008.  New York, NY.  Certificate of Participation.

146. North American Spine Society – Minimally Invasive Spine Surgery: A Hands-on Course.  June 6-7, 2008.  Spine Masters Institute.  Burr Ridge, IL. Certificate of Participation.

147. Interventional Spine.  PERPOS Surgical Training Program.  February 15, 2008.  Clifton, NJ. Certificate of Recognition.

148. Spineology Physician Instructor at Bergen Passaic Ambulatory Surgery Center.  Didactic and Hands-on Cadaver Implantation of OptiMesh Surgical Mesh System.  February 15, 2008.  Clifton, NJ.

149. Cedar-Sinai Institute for Spinal Disorders - 7th Annual Symposium on Current Concepts in Spinal Disorders.  February 1-2, 2008.  Las Vegas, NV.  Certificate of Participation.

150. Saint Louis University School of Medicine – The 1st CSRS Hands-On Cadaver Course.  Cervical Spine Decompression & Stabilization Techniques.  January 18-19, 2008.  Certificate of Participation.

151. Saint Louis University School of Medicine - The 1st CSRS Cervical Spine Decompression & Stabilization.  January 18-19, 2008.  Certificate of Attendance.

152. Medtronic Midas Rex Institute – Instruction in advanced high speed instrumentation for surgeons.  St. Louis, MO.  January 17, 2008.  Certificate of Attendance.

153. Spine Conference Case Presenter – Lenox Hill Hospital, NY.  December 13, 2007.
Weill Cornell Medical College, NY – Minimally Invasive Spinal Surgery and Navigation.  November 30 – December 1, 2007.  Certificate of Attendance.

154. University of California, San Diego School of Medicine – Minimally Invasive Surgery of the Spine 2007.  November 16-17, 2007.  Physician Certificate of Credit.

155. North American Spine Society – 22nd Annual Meeting.  Austin, TX.  October 23-27, 2007. Certificate of Completion.

156. North American Spine Society – Interbody Fusion Technologies.  Austin, TX.  October 23, 2007. Certificate of Completion.

157. North American Spine Society - Motion Stabilization: A Hands-On Course. May 18-19, 2007. Spine Masters Institute. Burr Ridge, IL. Certificate of Participation.

158. 19th Annual International Bethesda Spine Workshop: Thoraco-Lumbar Course. May 6-7, 2007. Certificate of Participation.

159. 19th Annual International Bethesda Spine Workshop: Cervical Course. May 4-5, 2007. Certificate of Participation.

160. AOSpine North America Challenges and Complications in Complex Spine Surgery Symposium. San Francisco, CA. April 28-29, 2007. Certificate of Participation.

161. North American Spine Society – NASS Spring Break 2007: Back to the Future: Straight Spines, Straight Talk. March 14-17, 2007. Certificate of Attendance.

162. MinSurg Biomechanical Innovations – TruFUSE Surgical Training. February 17, 2007. Certificate of Completion.

163. Surgeon Training Program for Atavi Minimally Invasive Posterior Cervical & Upper Thoracic Surgery conducted by Endius, Inc. September 9, 2006. Certificate of Attendance.

164. Zimmer Spine – Dynesys Dynamic-Stabilization Workshop at St. John's Health Center – Santa Monica, CA. July 21-22, 2006. Certificate of Attendance.

146. Zimmer Spine – Center of Excellence Program at St. Mary's Hospital – West Palm Beach, FL. June 1-2, 2006. Certificate of Attendance.

165. University of South Florida – Preservation of Motion in the Spine. April 5-8, 2006. Certificate of Completion.

166. North American Spine Society – NASS Spring Break: Back to the Evidence. March 8-11, 2006. Certificate of Completion.

167. The Royal College of Physicians & Surgeons of the United States of America. 5th Global Congress of Minimally Invasive Spinal Specialists. Laser Assisted Spinal Endoscopy, Nucleoplasty & Coblation, Percutaneous Cervical Discectomy, Vertebral Augmentation, Foraminal Decompression, Laser Facet Rhizotomy, Laser Sympathectomy, Epiduroscopy. December 15-18, 2005. Certificate of Attendance. 18th Annual Meeting of the International

168. Intradiscal Therapy Society (IITS). May 25-28, 2005. Certificate of Participation.

169. Spineology Physician Instructor at Market Street Surgical Center.  Didactic and Hands-on Cadaver Implantation of OptiMesh Surgical Mesh System.  Saddle Brook, NJ.  May 7, 2005.

170. National University of Health Sciences – Lincoln College of Postprofessional, Graduate & Continuing Education. Manipulation Under Anesthesia. April 4, 2005. Certificate of Proficiency.

171. University of South Florida – Preservation of Motion in the Lumbar Spine. March 17-20, 2005. Certificate of Completion.

172. University of South Florida – Preservation of Motion in the Lumbar Spine Labs. March 18, 2005. Certificate of Completion.

173. North American Spine Society – Advanced Lumbar Spine Surgery: Minimally Invasive Surgery and Motion Preservation: A Hands-On Course. March 4-5, 2005. Certificate of Completion.

174. North American Spine Society – Cervical Fixation: A Hands-On Course. January 21-22, 2005. Certificate of Completion.

175. North American Spine Society – 19th Annual Meeting. October 27-30, 2004. Certificate of Attendance.

176. North American Spine Society – NASS 19th Annual Meeting Techniques Workshop: Minimally Invasive Spine Surgery: Decompression & Fusion/Implants. October 26, 2004. Certificate of Completion.

177. North American Spine Society – NASS 19th Annual Meeting Techniques Workshop: Percutaneous Vertebral Augmentation. October 26, 2004. Certificate of Completion.

178. The 11th Congress of the International Musculoskeletal Laser Society. May 12-15, 2004 in Seoul Korea. Certificate of Attendance.

179. Continuing Education, Inc. – Minimally Invasive Spine Update 2004. March 26-28, 2004. Certificate of Participation.

180. Continuing Education, Inc. – Fourth Global Congress: Minimally Invasive Spinal Surgery and Medicine. November 19-22, 2003. Certificate of Participation.

181. American Association of Medical Foot Specialists. Attended course: Problems in Wound Management. November 2, 2003.

182. American Society of Interventional Pain Physicians – Active Member since March 2002.

## ABSTRACTS:

183. Kaul R.  Percutaneous Lumbar Fusions in the Outpatient Surgical Practice. 2nd Annual Meeting of the International Society for the Advancement of Spine Surgery Middle East Chapter (SASME). Feb. 4, 2011. Movenpick, Dead Sea, Jordan.

184. Datta S., Kaul R., Manchikanti L.  Letter to Editor:  Is there really a cause-effect relationship between steroid dose, pain management practices, joint injected (sacroiliac joint), and infection?  Reg Anesth Pain Med. 2011 Jul-Aug; 36(4):410.

185. Datta S., Kaul R.  Outpatient Thoracic Endoscopic Discectomy (PETD) for Herniated Thoracic Disc with Thecal Sac Adhesions: Case Report and Review of Literature.

## PROCTORSHIPS:

186. Amendia Education/Certification Proctorship.  December 3, 2011. Pompton Lakes, NJ.

187. Amendia Education/Certification Proctorship. October 8, 2011. Pompton Lakes, NJ.

188. Disc-FX Education/Certification Proctorship.  September 10, 2011.  Baldwin, NY.

189. Disc-FX Education/Certification Proctorship.  July 23, 2011. Newport Beach, CA.

190. Disc-FX Education/Certification Proctorship.  June 11, 2011. Dallas, TX.

191. Disc-FX Education/Certification Proctorship. April 30, 2011. Pompton Lakes, NJ.

## WEBINAR HOST/CASE PRESENTATIONS:

192. Motion Sparing Devises as an Alternative to Fusion. Webinar Host. September 27, 2011.

193. Grade 1/2 Spondylolisthesis. Case Presentation. September 27, 2011.

194. Lumbar Herniated Disc and Junctional Syndrome. Case Presentation. September 27, 2011

195. Advanced Medical Techniques Designed to Compliment Chiropractic Care. Webinar Host. September 20, 2011.

196. Discography and the Silent MRI. Webinar Host. August 2, 2011.

**PHILANTHROPY:**

197. The Spine Africa ProjectFounded in August 2008. The mission of The Spine Africa Project focuses on three objectives: the treatment of those afflicted with spinal conditions, the education of local medical personnel, and social change.

198. Jason Sendwe Hospital-Lubumbashi, Democratic Republic of Congo. December 1 – 5, 2008.

199. MyungSung Christian Medical Center-Addis Ababa, Ethiopia.  December 11 – 15, 2010.

200. Panzi Hospital-Bukavu, Democratic Republic of Congo.  August 20 – 25, 2011.

201. Panzi Hospital-Bukavu, Democratic Republic of Congo.  February 5 – 10, 2012

**PROFESSIONAL BACKGROUND-PART 2**

**1996-2016**

202. In September 1996 Dr.Kaul obtained his post-graduate degree from the American Board of Anesthesiology after having completed six years of residency training in general surgery and anesthesiology. The examination process involved a one day written exam that was taken in new York in 1995, and a one day oral exam that was taken in San Francisco in 1996. Thirty percent of graduates fail the examination process on their initial attempt.

203. In August 1996 Dr.Kaul was given a plenary medical license by the state of New Jersey. The license was awarded based upon his five years of medical school, eight years of clinical post-graduate training, the passing of both the FMGEMS and FLEX examination processes and multiple letters of recommendation from his professors and physician colleagues.

204. The plenary license given to Dr.Kaul gave him the right to practice both medicine and surgery and is the same license under which he performed minimally invasive spine surgery between 2003-2012

205. In July 1988 after completing medical school Dr.Kaul took and passed part 1 of the FMGEMS given by the ECFMG in preparation for his relocation to the United States and in July 1989 he passed part 2 of the examination.

206. In July 1993 Dr.Kaul took and passed both parts of the Federal Licensing Examination (FLEX) that was administered in Pittsburgh.

207. In July 1995 after completing his anesthesiology residency at the Montefiore Medical Center/Albert Einstein Hospital in the Bronx Dr.Kaul returned to Great Britain. He had trained in the US on a J-1 visa, a condition of which was that the holder had to return to their country of origin for two years, before they would be eligible to re-enter the US on a work visa.

208. From September 1995-September 1996 Dr.Kaul completed a fellowship in interventional pain at the Bristol Royal Infirmary. It was his intention to then spend the following year at The University of Sydney in Australia undergoing a further years training in interventional pain, but for personal reasons chose to remain in the UK.

209. Dr.Kaul's decision to remain in the UK prompted the head of the anesthetic department at the BRI, Professor Sir Cedric Prys-Roberts, to advise Dr.Kaul that he should make an application to the Specialist Training Authority to have his name included on the specialist register. The inclusion would have enabled Dr.Kaul to apply for National Health Service (NHS) consultant positions.

210. Professor Sir Cedric Prys-Roberts was the 1994-1997 president of the Royal College of Anesthetists and one of the highest ranking physicians in the UK.

211. In September 1996 after having successfully completed his fellowship Dr.Kaul returned to London and entered private practice.

212. Dr.Kaul was at the BRI during what became known as The Bristol Cardiac Case and discussed the highly politicized nature of the controversy with several of the anesthetic consultants directly involved in the pediatric mortalities. In late 1996 during a dinner in London one of the consultants advised Dr.Kaul of the professional risks he faced if he mounted a challenge against the RCA. Shortly after this Dr.Kaul's consultant, Dr.Robert Johnson, invited Dr.Kaul to join the anesthetic department at the BRI. He declined the offer.

213. In early 1997 Dr.Kaul submitted his application to the STA. The supporting documentation included copies of his American post-graduate degrees, diplomas and certificates.

214. In late 1997 Dr.Kaul received a letter from the STA which denied his application. The denial was based on advice received from the Royal College of Anesthetists that deemed Dr.Kaul's American training and board certification to be non-equivalent to British training and the fellowship examination of the RCA.

215. Dr.Kaul appealed the decision and demanded a public hearing. He was the only physician out of two thousand that had applied to the STA who requested a hearing in open court . As a consequence the case attracted significant media attention from Hospital Doctor, The London Independent and The Guardian. **( Exhibits 4 a + b )**

216. The STA scheduled the appeal for February 2nd and 3rd 1999.

217. In early January 1999 Dr.Kaul's London solicitor, Oliver Mays, at the law firm of LeBrasseur J. Tickle, met with the president of the RCA, Professor Leo Strunin, who wanted to hold the hearing in private. Dr.Kaul advised Mays that he wanted to know the exact criteria the RCA had employed to assess his application and that in his opinion only a public hearing would provide the necessary platform.

218. On February 2nd and 3rd the matter was argued in London in front of an appellate panel that consisted of a retired British judge and two senior British physicians. Dr.Kaul, at the age of thirty-three, advocated on his own behalf and called two witnesses, who were described in the final report as impressive. **( Exhibits 5 a + b )**

219. The first witness was Professor Albert Sauberman who was the Chairman of the Anesthesiology Department at Montefiore Medical Center. He testified to both the quality and experience of American residency training and to the level of knowledge required to pass the ABA examination. He also provided testimony about the competence and character of Dr.Kaul

220. The second witness was eye surgeon, Dr.Sharaz Daya, who had graduated from medical school in Ireland and then undergone his post-graduate training in the US in New York and at the Johns Hopkins Hospital. He also provided testimony about the intensive nature of American residency training.

221. The STA was represented by a senior Queens Counsel (QC) , whose principal witness was Professor Leo Strunin.

222. Dr.Kaul cross-examined Professor Strunin which the British media reported as being "contentious". The thrust of Dr.Kaul's case was that the shorter time (4 years) of American training compared to the six years in Britain did not necessarily equate to non-equivalency. The argument he advanced was that his training, although temporally shorter, was more intensive than that of a British trainee and therefore his four year experience was at the least equivalent to the six year experience of a British trainee. **( Exhibit 6 )**

223. As noted in a 2003 report issued by Professor Sauberman in the matter of New Jersey v Richard Arjun Kaul the British government in 1999 under Tony Blair became very interested in the case because of the media attention it had received but more importantly because of the implications of the case. Blair's government had just signed a treaty with the European Union which granted doctors trained in the EU access to the British market on the condition that they were able to demonstrate educational equivalency. The arbiters of this process were the British Royal Colleges led notably by the three hundred year old Royal College of Surgeons. According to Professor STA as a critical case that if he won would by implication mean British training was unnecessarily long. A victory for Dr.Kaul had the potential to compromise the ability of Blair's government to staff the NHS and which would have been a significant political hurdle for the Prime Minister. **( Exhibit 7 )**

224. Dr.Kaul had very publicly challenged the British Government and medical establishment.

225. In early March 1999 the panel issued its decision which agreed with the position taken by the STA that Dr.Kaul's American training and board certification were not equivalent to British training and the Fellowship of the Royal College of Anesthetists (FRCA). It stated that for Dr.Kaul to be brought up to British standards he would need to undergo a further eighteen months of training in the British system and then pass both parts of the FRCA. **( Exhibit 8 )**

226. Dr.Kaul decided to return to the US and commenced the reactivation of his plenary New Jersey medical license.

227. On March 9th 1999 at approximately 3.15pm GMT Dr.Kaul administered an intravenous sedation for a dental procedure to a fifty-seven year old female from Sierra Leone by the name of Isatu Bangura. The wisdom tooth extraction lasted lasted seventeen minutes and was performed at the Dalston Dental Clinic in north London by an Italian dentist called Stefano Zucchi.

228. As Zucchi removed the bite block from the patient's mouth she went into cardiac arrest but was successfully resuscitated by Dr.Kaul. An ambulance was called and the patient was driven to the nearest hospital, The Homerton. However due to the chronic bed shortage in the NHS she was turned away and spent the next three hours in the back of the ambulance before a bed was allocated at The London Hospital in Whitechapel. Professor Strunin was the head of the Anesthetics Department at The London Hospital.

229. The patient was admitted to the ICU at 7pm after having been in the back of an ambulance for three hours due to the NHS bed shortage. According to the medical notes from the hospital she regained consciousness on March 10th 1999.

230. From March 9th-March 16th she came under the care of approximately fifteen other physicians but sadly died on the morning of March 16th 1999.

231. Strunin contacted The London Metropolitan Police and Scotland Yard on Thursday 11th March, three days before the patient died. On Friday 12th twelve officers from the Criminal Investigation Department (CID) raided the dental clinic and turned the facility into a crime scene. Dr.Kaul was in Manchester that afternoon meeting with John Ryan, the CEO of The Transform Medical Group, but was contacted at approximately 7pm by one of his employees who informed him of the incident.

232. On Saturday March 13th Dr.Kaul telephoned The London Metropolitan Police to enquire as to why they had turned the dental clinic into a crime scene. The officer requested that Dr.Kaul meet with his team at the building on Sunday afternoon as they had some questions they wanted to ask him. Dr.Kaul, at that point unfamiliar with the British criminal justice system, agreed.

233. Between 3pm-5pm on Sunday 15th March 1999 Dr.Kaul met with three plain clothes officers at 1 Balls Pond Road, Dalston. He was asked numerous questions by the officers as they inspected the facility. At approximately 5pm the head detective requested that Dr. Kaul follow them to their headquarters where he stated they "had a few more questions they would like answered".

234. From 5.15pm-9pm Dr.Kaul was questioned without legal representation and under caution by

Detective David Hindmarsh and one of his associates. The interview was recorded and used as evidence in the subsequent criminal case brought against Dr.Kaul by the Crown Prosecution Service.

235. The police investigation lasted eight months and approximately one hundred and twenty witnesses were interviewed. Dr.Kaul was legally represented by the Medical Defence Union which retained the services of London law firm s. The solicitor placed in charge of the case was Ian Barker.

236. On October 14th 1999 the CPS brought criminal charges against Dr.Kaul who was arrested on October 15th by The London Metropolitan Police and charged with the uniquely British crime of 'medical manslaughter'. The British Medical Association has been fighting since the 1990s to have the statute repealed after an act of Parliament in 1996 that extended the applicability of the statute to physicians, but which had been previously applied principally to truck drivers ( the Adomako case ) However the political value of the law, as opined by Professor Sauberman in his 2003 expert report, had prevented its modification by the British government and physicians continue to be criminally prosecuted for clinical events, that in the US would be administered through civil litigation. The majority of targeted physicians are of Asian or African descent. Dr.Kaul is an Indian citizen and as described in Professor Sauberman's report he considered racial discrimination a relevant consideration in Dr.Kaul's decision to practice in the UK. The issue of racism in the NHS was one of the reasons Dr.Kaul left the UK after he graduated from The Royal Free Hospital School of Medicine. However he was obligated to return to the UK in 1995 because of his J-1 visa requirement.  **( Exhibit 9 a + b )**

237. On December 9th 1999 Dr.Kaul appeared before The General Medical Council to answer questions about the Isatu Bangura case. The GMC imposed an interim order on his UK medical registration which limited his ability to practice and thus earn a living. At the time of his arrest Dr.Kaul was living in an apartment under a dental practice he owned in Covent Garden, London but sold the practice to an Irish dentist to fund the fight for his freedom. He also sold the building he owned in Dalston in which the dental practice was located. Some of the money was used in 2001 to purchase a six acre plot of land in Uvita, Costa Rica.

238. Dr.Kaul secured a job as Resident Medical Officer at The London Welbeck Hospital and was given an apartment next door. During the period from December 1999 to February 2001 Dr.Kaul established the Regency Medical Clinic which employed several plastic surgeons to perform cosmetic surgery. He worked with a London based digital marketing firm to develop the business. The revenue from the venture assisted in his legal defense.

239. The criminal case was remanded to the Old Bailey Court in London with a trial commencement

date of May 9th 2000.

240. The MDU organized what was referred to as 'The A Team' to defend Dr.Kaul. The solicitor was Ian Barker, the barrister was Alan Jenkins and the Queens Counsel was Anthony Arlidge. Six medical experts issued reports and testified in defense of Dr.Kaul. One of the six was Professor John Ledingham, the head of medicine at the University of Oxford. The opinion advanced by these physicians was that the cardiac arrest had occurred due to a pre-existing potassium deficit or hypokalemia which predisposed her to ventricular arrhythmias. ( Exhibits 10 a + b + c + d + e + f )

241. The prosecution was brought by the Crown Prosecution Service in the name of Queen Elizabeth (Regina) and on behalf of the British Government. The QC was the second most senior prosecutor in the UK, William Boyce, and the main expert for the prosecution was Dr.Patricia Flynn who was Professor Strunin's deputy in the academic department of anesthetics at The London Hospital. Dr.Flynn interviewed Dr.Kaul on Wednesday March 18th 1999 in his office at The Dalston Dental Clinic before Dr.Kaul had informed the MDU of the matter. She incorporated the information from this meeting into her expert report.

242. The judge initially assigned to the case was the most senior jurist at The Old Bailey, Michael Hyam, QC . However due to the immense volume of expert reports and witness evidence the trial was rescheduled to commence January 21st 2001 and was ultimately presided over by the second most senior judge, Lord Neil Dennison,QC.

243. The decision to prosecute Dr.Kaul was taken by the head of the CPP, Sir David Calvert-Smith, who had been appointed by British Prime Minister, Tony Blair whose government Dr.Kaul had challenged in his appeal against the STA/RCA. The timing of the prosecution coincided with a number of high profile public defeats the CPS had endured and the media attention Dr.Kaul's STA challenge had attracted likely played a role in the decision to prosecute with a view to enhancing its reputation.

244. In April 2000 Dr.Kaul made an application to the court to travel to Australia to see his then fiancée. He was granted permission after he submitted his travel itinerary to the CPS. While in Darwin in the northern region of the country he called his brother in London who informed him that Scotland Yard had contacted the Washington Bureau of the FBI, as they were not able to find his name on the flight roster and concluded that he had become a fugitive. The officers at Scotland Yard incorrectly  assumed that Dr. Kaul had travelled in economy instead of business. The FBI visited Professor Sauberman in New York at Montefiore Medical Center to enquire as to whether he had seen Dr.Kaul, who upon learning of the confusion called Ian Barker and informed him of his location.

32

245. Dr.Kaul travelled one more time before the trial when he visited Cape Town in South Africa in December 2000.

246. On January 21st 2001 the trial commenced at the Old Bailey in courtroom number six. The theory advanced by the experts for the CPS was that the patient had been deprived of oxygen for at least four minutes which caused her to suffer a hypoxic cardiac arrest. The argument was predicated on an allegation by the dental nurse that Dr.Kaul had been talking on a mobile phone during the case and had, in their opinion, been distracted which caused the oxygen deprivation. An engineer from the phone company testified at trial that based on his digital analysis of all incoming and outgoing calls, none of the phones in Dr.Kaul's name were in use for an hour before or after the cardiac arrest. The CPS accepted this fact in the form of legal submission. ( **Exhibit 11** )

247. Dr.Kaul instructed his family not to attend the trial  but a number of his close friends spent several days in the public gallery watching the proceedings. Dr.Kaul's closest friend, facial reconstructive surgeon, Martin Hirigoyen Kelly, observed Dr.Kaul testify. Kelly was married to the Californication actress Natascha McElhone whose step-father is Roy Greenslade, a senior editor on Fleet Street. Greenslade trained Jon Swaine, the journalist that covered Dr.Kaul's case with the NJBME. Dr.Kaul had been friends with Dr.Hirigoyen since they were eighteen and was godfather to his first son. Dr.Hirigoyen died suddenly from a cardiac arrest in 2008, an event that was widely reported. ( **Exhibit 12** )

248. Approximately thirty witnesses testified and Dr.Kaul spent three days on the witness stand, one under direct and two under cross examination. The matter was remanded to the jury on February 20th and after two days of deliberation in which a unanimous verdict was not obtained the judge instructed them that he would accept a majority verdict. In the attachement 'Explantion ofCriminal Conviction in the UK' Dr.Kaul explains the differences between the UK and US charge. He attached this document to healthcare regulatory and insurance applications. ( **Exhibit 13** )

249. Prior to the verdict Dr.Kaul recollects his QC, Anthony Arlidge, informing him that the judge was "under a lot of pressure". Prior to the commencement of the trial Dr.Kaul had unsuccessfully attempted to have his legal team introduce evidence of his challenge to the STA/RCA as be believed his prosecution was political ,as did Professor Sauberman as evidenced in his 2003 expert report to the NJBME. No reason for not including this evidence in the trial was ever given to Dr.Kaul by his lawyers. Information about the trial was also communicated back to the Blair government through his wife, Cherie Blair, who is a London based QC that had close professional connections to the head of the CPP, Sir David Calvert-Smith.

250. The jury delivered a guilty verdict at approximately 3pm on February 22nd 2001. Lord Dennison did not send Dr.Kaul to jail and in his sentencing remarks referred to the severe penalty Dr.Kaul had already paid with the loss of his professional reputation, the fact his fiancée had broken off their engagement and the "severe financial embarrassment" he had endured. No probation, court costs or fine were imposed and Dr.Kaul was allowed to walk out of the court. The courtroom was full as the verdict was delivered and both Strunin and Flynn were there to observe the jury's decision. Ian Barker commented to Dr.Kaul that he had never witnessed an expert attending the verdict.

251. One reason, as the judge stated in his sentencing remarks, why he did not send Dr.Kaul to jail included the approximately thirty letters of recommendation that had been sent to the court from previous patients and medical colleagues. A letter came from well known British actress, Sue Pollard, to whom Dr.Kaul had successfully administered anesthesia and another came from a patient, by the name of Caroline Ford, whose life Dr.Kaul had saved when she had an allergic reaction to a local anesthetic injected by a surgeon. Professor Sauberman also sent a letter as did several of Dr.Kaul's physician colleagues from America. **( Exhibit 14 )**

252. Another factor that Dr.Kaul believes played into the judge's decision not to imprison him was the opinion expressed at the end of the trial by Ms.Bangura's family that they did not want Dr.Kaul to go to jail. Alan Jenkins communicated this detail to Dr.Kaul approximately three hours before the verdict was delivered.

253. After the sentence was delivered Dr.Kaul was informed by his QC that the CPS might appeal it. They did not. In the courtroom immediately after the judge had discharged Dr.Kaul he instructed his solicitor to convey his condolences to the family. At that point they chose not to accept them. Dr.Kaul has indicated in a number of his media productions his remorse for the demise of Isatu Bangura but believes he has paid his price. He is of the opinion that the media exploitation of the case by Mr. Christie in 2012 to grab headlines actually demonstrates a lack of regard by Mr.Christie for the family of Ms.Bangura, some of whom live in the US, and who it can be reasonably assumed do not want to be constantly reminded of her death.

254. As reported by the British media Lord Dennison left the judiciary three months after the Isatu Bangura case, due to differences with the Blair government over how to administer justice. Michael Hyam died in 2004 aged sixty-six.

255. There were many representatives of the media at the Old Bailey on February because of Dr.Kaul's case. According to Ian Barker Profesor Strunin had instructed every expert to be available for the verdict.

256. There were also two other high profile trials that had been running concurrently with that of Dr.Kaul's and one involved allegations against seven senior special forces police officers from the county of Essex who were accused of political corruption. All of the defendants in this case were found guilty on February 9th but were sentenced on February 22nd. The other case was a prosecution of thirteen men from Afghanistan who had been accused of terrorism charges. Nine were found guilty on February 23rd 2001. These concurrent three trials partly accounted for the intense media coverage. Dr.Kaul's case was reported widely in the British press with stories that appeared in most of the major broadsheets , almost all of the tabloids and on the six o'clock news on the BBC. All of the media inaccurately reported that a mobile phone, was used despite the legal submission from the CPS that it had not been used. Dr.Kaul sent a letter to the BBC in December 2015 to request they correct their mistake. Because of the internet the mobile phone detail has continued to be inaccurately reported by other media sources, politicians and lawyers and in the current litigation it was included in a 2012 story by CBS New York.

257. Dr.Kaul did discuss the matter with Ian Barker but he believed the story would cease to be important as time passed. The internet proved him wrong.

258. The cost for the entire two year matter including legal and medical expert fees was three hundred thousand pounds which is approximately $450,000.

259. As a consequence of the conviction Dr.Kaul appeared before the full General Medical Council in March 2001. The GMC suspended his registration which meant that he had to stop working as a Resident Medical Officer at The London Welbeck Hospital. The loss of this job meant that he had to vacate the apartment but was able to live with his brother in Kent.

260. Dr.Kaul was thirty-four when the case commenced on March 9th 1999 and was thirty-six at its completion in February 2001 and therefore was not in a position to retire. He was still in possession of his New Jersey medical license and commenced the reactivation process which involved the completion of a number of forms that posed questions about professional and personal background. As Dr.Kaul subsequently testified in the April 2003 hearing before the NJBME he answered the questions that specifically asked about convictions in a state or federal jurisdiction. As his testimony indicates it was his literal reading and understanding that the questions did not relate to foreign jurisdictions as there had been no reciprocity with his American training in the UK. This issue was

brought to Dr.Kaul's attention when he was suspended from HUMC by the Chairman of Anesthesiology, Dr.Mark Schlesinger, and which caused Dr.Kaul to include the information from the UK on all of his subsequent professional applications.

261. The case in the UK had caused Dr.Kaul to file for bankruptcy, the breakdown of his relationship with his Australian fiancée, the loss of his British medical registration and the loss of his business and real estate assets. In addition he was about to sign an contract with the largest provider of cosmetic services in the UK, The Transform Medical Group, to provide anesthetic services and had met with its CEO John Ryan on the morning of March 9th 1999. The contract never came to fruition.

262. The intense media coverage of the case prompted Dr.Kaul to make several trips out of the country. He travelled to the US immediately after the verdict to spend time with friends and it was during this trip he decided to make an attempt to return professionally to America and in his mind continue the plans he had set in motion after the STA decision.

263. During the period from February 2001 to September 2001 Dr.Kaul lived between London and Ibiza and spent the time recuperating from the stress of the trial. Dr. Kaul had not informed most of his family and friends about the case and the first time they came to know about it was when it appeared on national TV. In May Dr. Kaul met with a friend in London and during the lunch in Soho he unexpectedly encountered the British actress, Tara Fitzgerald, with whom Dr.Kaul had been involved in a relationship during his third year in medical school. Knowing Dr.Kaul for sixteen years she made the comment " I have no doubt you will be back on your feet in no time". The comment she made was almost prophetic as two years later Dr.Kaul reported an American income of almost $4 million. When Dr.Kaul returned to the US on September 29th 2001 he had $150 and slept on the couch of his friend, Ford model Roy Summersett, who owned an apartment in the Manhattan district of Gramercy Park.

264. Dr.Kaul returned to the US on September 29th 2001 three weeks after the attacks on the World Trade Centers. The second tower held a special memory for Dr.Kaul as it was where he celebrated his marriage in 1993 at the age of twenty-seven to Dutch-Indonesian model named Petra Aronson.

265. On October 1st 2001 Dr.Kaul commenced work at Hackensack University Medical Center in Hackensack, New Jersey. He joined the anesthesiology department and because of his expertise in interventional pain he was assigned to work in the pain clinic with Dr. James Haliczer. Dr.Kaul, as is evident that the recommendation letter sent by Mark Schlesinger in February 2002 to Columbus Hospital, was held in high regard by his professional colleagues at the hospital.

36

266. However his interactions with neurosurgeon, Dr.Thomas Peterson, were less than collegial and it was in 2013 that Dr.Peterson referred to Dr.Kaul as a "murderer" when he observed the sister of one of his patients wearing a baseball cap emblazoned with 'I support Dr.Kaul'. Linda Reyes was an employee at NJSR and related the incident to Dr.Kaul the day after it occurred which caused Dr.Kaul to send a letter to Dr.Peterson and the CEO of HUMC, Robert Garrett. Approximately nine days later Dr.Kaul received Dr.Peterson's legally guarded apology which was most likely a consequence of pressure applied by Robert Garrett. ( Exhibit 15 a + b + c )

267. On November 16th 2001 Dr.Kaul's privileges at HUMC were suspended after the NJBME had received information from the UK regarding the Isatu Bangura case. The office of the New Jersey attorney general, David Samson, contacted the HUMC medical director, William Black, who informed Mark Schlesinger that the hospital had decided to suspend Dr.Kaul's privileges. The letter confirming the action was signed by president of HUMC, John Ferguson.

268. David Samson is currently under investigation by federal authorities for his role in abusing his position as the chairman of the NY/NJ Port Authority to divert a United Airline flight route so that it would land closer to his holiday home in South Carolina. Samson is referred to as "The General" by Christie and was also the chairman of at the time of the lane closures into the GWB in September 2013.

269. John Ferguson was fired from his position as HUMC in 2009 after it emerged he had been involved with NJ senator, Joseph Coniglio and Bergen County Democratic Chairman, Joseph Ferriero, in the steering of state grants to the hospital. Ferguson's salary at the time and as reported by Lindy Washburn in the Bergen Record was $7.7 million. Coniglio was found guilty as his federal trial and sent to jail but Ferriero was able to have his conviction overturned by a federal Supreme Court ruling in 2010 that limited the powers of the Public Corruption Prosecution Improvements Act. However the US Senate has acted to enhance the powers of federal prosecutors in their pursuit of corrupt public officials. Ferguson is currently the  CEO and Chairman of Blue Horizon International, a Hackensack based company established by orthopedic surgeon Brian Mehling. The sexually ambivalent surgeon was introduced to Dr.Kaul in 2006 by Syrian chiropractor, Richard Sabbagh, as Mehling was looking for investors for his fledgling enterprise. After a number of meetings Dr.Kaul signed an agreement with Mehling and gave him $100,000 in return for shares in the company ,which Mehling stated was engaged in discussions with "influential" investors in Dubai to develop hospitals in the UAE. After several months of broken promises Dr.Kaul concluded that Mehling's scheme was a scam and sued him for the return of the monies. Dr.Kaul was able to recoup $70,000 but unfortunately Dr.Sabbagh has not to date been able to have his $50,000 investment returned. This is the company that is now headed by the individual that signed the letter suspending the HUMC

privileges of Dr.Kaul in November 2001. **( Exhibit 16 )**

270. Joseph Ferreiro was indicted in 2013 on federal racketeering charges in a case that involved lawyers from the one of the defendants, Scarinci and Hollenbeck, and the law firm of Decottis Fitzpatrick and Cole, whose healthcare specialist, Anthony LaBue had represented Dr.Kaul in 2003. Dr.Kaul had been referred to LaBue by his New York based immigration attorney, Gretchen Aylward, at the firm of Hiscock and Barclay located in the state capital Albany. Aylward had been given LaBue's name by a partner in her firm who commented that "Labue was the right man for the job". At the time Dr.Kaul heard this he understood it to mean Labue was a competent lawyer but he later came to understand it meant his firm was a well established part of the New Jersey 'pay to play' culture. **( Exhibit 17 )**

271. In November 2001 Dr.Kaul was introduced to Dina Tauriello by her cousin, Monica Paganessi, who was an anesthesiologist at HUMC. They became engaged during a trip to Thailand in January 2002 and Dina became pregnant with their first child in February 2002, the same month that Dr. Kaul commenced work at Columbus Hospital in Bloomfield New Jersey. It was this institution that Dr.Kaul became friendly with orthopedic surgeon Dr. Richard Boiardo whose great-grandfather was supposedly a New Jersey mafia kingpin known as "Richie the Boot" and on whose life the HBO series, The Sopranos, was based.

272. From February-August 2002 Dr. Kaul  was the director of the pain clinic at Columbus Hospital on whose board sat Monica's father, attorney Ralph Lilore. Lilore's son, Craig, was killed at the age of thirty in the September 11th 2001 attacks on the World Trade Centers in New York.

273. In early August 2002 Dr.Kaul received a letter from  deputy attorney general, Michelle Albertson, which asked him to answer questions about the UK case. Unfamiliar with the New Jersey legal landscape Dr.Kaul responded with a hand written note that detailed the sequence of events that culminated in the February 22nd 2001 conviction.

274. In late August 2002 Dr. Kaul voluntarily and under the name of Richard Wright entered The Sunrise House Drug Rehabilitation Center in Lafayette, New Jersey. He spent twenty-eight days in the facility during which he became the ping-pong champion and forged friendships with individuals he would otherwise never have had the opportunity to meet. Dina visited him weekly despite the fact she was seven months pregnant. Dr.Kaul was able to secure a position with the Morris Anesthesia Group based at St. Clare's Hospital while a resident at Sunrise House. Dr. Kaul left the facility on September 18th 2002 and remained in the AA program for approximately one year more. He has abstained to date from the use of the substances that caused him to seek help and does not currently

attend AA meetings.

275. The day after Dr. Kaul left Sunrise House he received notification from the NJBME that they had commenced legal proceedings to revoke his medical license based upon the UK case and an allegation that he had intentionally withheld information about the matter, when he completed the biennial license application. Later the same week he met with Anthony LaBue at the law firm of Decottis, Fitzpatrick and Cole. The firm demanded a $25,000 retainer to commence work on the matter which Dr. Kaul was able to pay out of the money he was owed and ultimately paid by the anesthesia group at HUMC. The inpatient stint at Sunrise House had cost him $10,000.

276. The deputy attorney general assigned to the case was Alan Niedz who when he was allegedly in London in December as a tourist, decided to visit the offices of the General Medical Council. A more believable explanation is that he was sent by the state to London to specifically gather information on the UK case. Regardless, the GMC gave him Dr. Kaul's entire file which included confidential medical information protected under the European Data Protection Act. Neither Neidz nor any of his superiors ever produced any official documents to demonstrate what information they gave to the GMC to encourage them to violate a European statute. The possibility of fraud on the part of the state of New Jersey might explain why the GMC subsequently refused to cooperate with Doreen Hafner in the 2012 case, that is one of the foundational elements of this complaint. It could also explain a comment made by Dr.Kaul's solicitor, Ian Barker, during a phone call in May 2012 when Barker expressed his sorrow at what had happened to Dr. Kaul. The purpose of the phone call was a request made by Dr. Kaul for the expert report of the mobile phone engineer, David Bristowe, which proved Dr. Kaul had not been on his mobile phone when Isatu Bangura suffered a cardiac arrest.

277. The unauthorized disclosure of Dr. Kaul's 'confidential' medical information, most likely based on a fraudulent application, added a dimension to the case that obligated Dr. Kaul to subject himself to clinical evaluations of his psychological status. The relevance of this serious violation of privacy is that it attacked the basis of confidentiality on which Dr. Kaul sought assistance, and from a public health policy it communicates a message that an individual's right to protect highly sensitive health

information is non existent. It is however a startling example of the theme of gross official misconduct that New Jersey public servants view as 'normal' and is one of the driving reasons for the political reform that this complaint seeks.

278. Anthony Labue included two other attorneys in the litigation, Susan Volkert, the wife of superior court judge Donald Volkert and Susan Fruchtman whose husband is a Montclair, NJ, writer that interviewed Dr.Kaul with a view to writing a book about his life. LaBue never explained the need for three attorneys to handle an administrative matter that spanned seven months and for which that the firm charged Dr.Kaul $500,000. This stands in stark contrast to the cost of the criminal matter in the UK that lasted two years and involved a complex four week trial that employed the some of the top legal and medical minds in the world. The exorbitant fee charged by Decottis, Fitzpatrick and Cole is an example of the exploitation of the New Jersey medical profession by the more 'politically connected' law firms and is evidenced in this complaint by the misconduct of the defendants who are currently licensed to practice law.

279. On November 5th 2002 the same day as Dr.Kaul's birthday his son Maxwell Ravi Kaul was born at Morristown Memorial Medical Center in Morristown, New Jersey. Ironically its parent healthcare system, Atlantic Healthcare System, is one of the defendants. He was delivered by cesarean section. At the time of his birth both Dina and Dr.Kaul were living with her parents at their house in Convent Station. Dr.Kaul commenced work at St. Claire's Hospital in Denville in December 2002 where he was placed in charge of the pain clinic at Dover General Hospital. It was during his time at this facility that he met Filipino physician Rodolfo Narag with whom he developed a productive working relationship. Dr.Narag would later come to work with Dr.Kaul at the NJSR Surgical Center in 2011 and was also victimized by the Christie administration as part of their campaign of harassment against all of Dr.Kaul's employees. Narag's health suffered immensely and he developed bowel cancer due to the stress. His ethnic background played a role in the attacks on his professional standing and is consistent with the fact that the majority of New Jersey physicians whose licenses are revoked belong to ethnic minorities.

280. One of the experts who produced a report in support of Dr.Kaul was retired NJ Superior Court Judge, Barnert Hoffman, who opined that in his thirty years a prosecutor, defense lawyer and judge he had never encountered a case similar to the one Dr.Kaul had experienced in the UK. **( Exhibit 18 a + b )**

281. In April 2003 Dr. Kaul appeared before the NJBME in Trenton at the Richard J Hughes Justice Complex and testified in defense of his legal position. Professor Sauberman was in attendance and was prepared to testify on Dr.Kaul's behalf but was denied the opportunity by the NJBME. Paul Goldiner, the Chairman of the Anesthesiology Department at Mount Sinai had also submitted an expert report on behalf of Dr. Kaul but was not allowed to testify. Dr. Kaul specifically remembers Professor Sauberman describing the NJBME as a very powerful medical board. At the time Dr. Kaul did not understand why but did so when his attorney, Robert Conroy, argued his case on June 13th 2012. Conroy argued for a change in the state's constitution that would separate the office of the attorney general from that of the medical board. Unlike most other states in America the NJBME and the NJ Attorney General are both part of the executive branch of government which are controlled by the governor and which thus makes the entire process inherently unjust and open to political abuse. The case for the state was made by Jeri Warhaftig who asked the NJBME to revoke Dr. Kaul's license. Just prior to the hearing Warhaftig offered Dr. Kaul a two year suspension. He respectfully declined and chose to take the matter to a full public hearing which commenced at 9.30am and concluded at 8pm. The final decision of the NJMBE was to issue a 6 month suspension with a $10,000 fine and $45,000 in legal costs payable to the state. The NJBME noted Dr.Kaul's ability as compassionate and competent physician in their final decision. The day after the hearing Labue told Dr.Kaul that the attorney general's office, under the control of David Samson and Governor James McGreevey, was very upset at the outcome. McGreevey was forced to resign his position in 2004 when it emerged he was gay and had hired one of his close male companions for a governmental position for which he was unqualified. Dr.Kaul met McGreevey's wife Dina who worked at Columbus Hospital at the same time that Dr. Kaul was an employee. In fact in 2003 Mark Mannigan had suggested to Dr.Kaul that he should ask Dina McGreevey out on a date. Dr. Kaul remembers thinking this was odd considering she

41

was married but realized why, when the governors sexual proclivity became public. Christie and McGreevey have publically displayed their admiration for each other as has US Senator Corey Booker for Christie. ( **Exhibit 19** )

282. Just prior to the April 2003 hearing Dr.Kaul had borrowed $80,000 from Dina who had saved the money after the sale of her Manhattan apartment. The money was used towards the legal bills that the Decottis firm had charged. The monies paid from September 2002 to April 2003 for the matter had already risen to $105,000. Three lawyers had been appointed to handle the case and of significance all three attended the hearing but only Volkert advocated. Dr.Kaul did still not understand why three lawyers were necessary to argue the matter. That was until he received the $500,000 final bill from LaBue.

283. An appeal was lodged with the NJ Appellate Court in May and a hearing date was scheduled for December 2003 and immediately afterwards LaBue sent Dr.Kaul an invoice for $500,000 which Dr.Kaul found a shocking amount. In trying to understand the legitimacy of the bill he recollected a conversation with Labue in which the latter considered the average cost for medical license case was $100,000. LaBue had worked for the office of the NJ attorney for many decades and had obviously become familiar with the 'racket' that involved specific dollar amounts being attached to the value of a physician's license. What did not seem relevant to the large 'politically connected' law firms was the actual work needed for the file, but more an assessment on the part of the lawyer of how much they could extract from the physician with overbilling and the assignment of too many attorneys to the litigation. Dr.Kaul disputed the bill with LaBue who stated that he was disappointed considering the result he had obtained through the "special connections" his law firm had in Trenton. McGreevey is a democrat and the law firm of Decottis is one of the largest donors to the Democratic Party. Dr. Kaul had no idea that this type of misconduct was part of the New Jersey medico-legal landscape.

284. Depsite what Dr.Kaul considered an excessive amount he agree he would pay the money but asked Labue if could the payment could be structured over six months. Dr.Kaul was able to continue

working until the December appeal and planned to use his earnings to pay the legal fee. Labue refused his request and suggested he take a loan from a bank. He even went so far as to organize a financial consultant to facilitate the process. Dr. Kaul made the application to several lending institutions but because he had no credit in the US he was denied. In June 2003 the firm of Decottis sued Dr.Kaul in Bergen County Superior Court which forced him to retain another lawyer for the license appeal.

285. A colleague of Dr. Kaul's recommended Mark Mannigan at Wolf Brach Eichler. Dr.Kaul met with Mannigan in late 2003 and a cordial relationship commenced. Mannigan was a young attorney who seemed more interested in the political/business aspects of the NJ medico-legal world than actually administering legal files. He was appointed to the NJ Health Committee in 2009 by Christie and was a member of Christie's 2009 'transition team' . Dr.Kaul was referred to Joseph Gorrell who had, like Labue, worked in the attorney general's office before entering private practice. Gorrell advocated the matter before the appellate court on November 5th 2003 and the court issued its decision one month later which upheld the decision taken by the NJBME.

286. From December 2003-June 2004 Dr. Kaul underwent further education in the emerging field of minimally invasive spine surgery in both the US and internationally. He had commenced his training in this specialty in early 2003. He paid the $55,000 to the NJBME and settled the Decottis case on the morning of trial for $100,000, which they agreed to accept in payments. The law firm of Brach Eichler represented Dr.Kaul in the litigation. On the morning of trial LaBue communicated to Dr.Kaul that he had been very sick for the previous six months and wanted to bring the matter to a conclusion. He also told Dr. Kaul that he should start spending less time in courtrooms and more in the operating room. This had always been Dr. Kaul's intention. The next decade would prove that despite his best efforts to remain in the clinical arena there was always some challenger who brought him back into the legal arena. Of significance is the fact that 90% of the litigation in which he has been involved was initiated by other parties attempting to exploit the UK case for financial gain.Dr.Kaul believes the UK

case made him an easy target for frivolous legal action from patients, insurance companies,

disgruntled employees and an avaricious ex-wife. However he presented the biggest target to his

professional competitors by building a successful practice, and a corrupt governor in charge of an

attorney general's office that was probably still smarting from their 2003 defeat. ( Exhibit 20 )

287. In June 2004 Dr.Kaul returned to work and commenced rebuilding his reputation and practice.
In February 2005 he performed the first outpatient lumbar interbody fusion at The Market Street
Surgical Center in Saddlebrook, New Jersey. The case and his rapidly growing medical business
started to attract the attention of the neurosurgical community. Information about his work would be
communicated through a network of surgical sales reps. Marcel Pouliot, Graig O'Brien and Robert
McGann worked closely with Dr.Kaul as they also did with Drs. Heary, Cohen and Moore.

288. From June 2004-April 2012 Dr. Kaul built one of the largest solo minimally invasive spine
practices in the US. His reputation as a competent and innovative physician grew rapidly in the
medical community. Becker's Spine and ASC is largest trade organization in the spine sector and
regularly featured stories on both his clinical work with NJSR and his philanthropic work with the
Spine Africa Project.  The latter is a 501 (c) 3 US based charity which provided free healthcare and
education to impoverished communities in both the US and Africa until the defendants committed
the crimes that caused this complaint to be filed.

289. From June 2004-April 2012 the revenue generated by Dr.Kaul's corporations increased by
approximately 500%  and his case volume increased by 300%. The size and complexity of his
business increased and several corporations were established to administer the component parts of
the entire operation. This arrangement allowed a more specific business analysis, separated liability
and developed an efficient patient centric business that complied with all regulatory and legal
requirements. Dr.Kaul collected clinical and financial data to asses the actual value of his services to
his patients from both a therapeutic and economic perspectives. These numbers compared favorably
with the indices-Meadowlands- generated from hospitals. The NJSR Surgical center was reported by
the Bergen Record in 2011 to have a 0% infection rate after spine surgery compared to the 3%
reported for hospitals. One of the main drivers for elevated healthcare costs has been the
management of post-operative infections. This is recognized in the ACA and is consistent with the

results that Dr.Kaul achieved.

290. In 2008 Dr.Kaul commenced his philanthropic in Africa with an initial trip to Ethiopia and the Democratic Republic of Congo. It was from this experience that Dr.Kaul established The Spine Africa Project. The entity was incorporated in New Jersey in 2011 and obtained 501 (c) 3 status in 2013. The Christie administration aggressively attacked the charity with investigative subpoenas, fictitious fraud complaints and in collusion with TD bank a complaint was filed in 2013 with www.checksystems.com that prevented Dr.Kaul from opening a bank account to allow the charity to function. Regardless Dr.Kaul continued his philanthropic work through The Invictus Initiative, a program of the SAP named after the poem 'Invictus' by English poet, William Earnest Henley, that was written on Nelson Mandela's prison wall on Robben Island. The program involved Dr. Kaul talking to young boys and men in both correctional facilities and drug rehabilitation houses. **(Exhibit 20)**

291. In May 2008 Dr. Kaul purchased a building at 111 Wanaque Avenue, Pompton Lakes and commenced the application process with the Medicare, AAAHC, the state of new Jersey and the town of Pompton Lakes to convert it into a 'one-room' surgical center. The use of the term 'one room' refers to the fact that there is one operating room and NOT just one room in the entire facility. The NJSR Surgical Center was a 4000 square feet facility that obtained both Medicare certification and AAAHC accreditation, after a two year construction period and rigorous inspections from the federal government. AAAHC initially gave the facility a three year certification but after the negative publicity surrounding the crimes committed by the defendants they replaced it with a one year certification. The Christie administration and The Bergen Record intentionally misrepresented this term to dishonestly create the impression that Dr. Kaul was operating literally in just ONE room. The video-link attached in the exhibit shows a state of the art facility that incorporated cutting edge innovative technology which allowed Dr. Kaul to successfully perform thousands of cases with no mortalities, no life threatening complications and successful outcomes in 90-95% of cases. He also provided high quality care that was cost effective due to the fact that patients were discharged the same day as compared to the high charges associated with overnight stays in hospitals.

292. The success of NJSR Surgical Center and the excellent reputation Dr. Kaul had established through his global professional and philanthropic work caused immense jealousy in the medical community. It also caused frustration from the insurance carriers who were obligated to pay the fees associated with the care Dr. Kaul delivered to their clients. The information about the rising tide of animosity came through the surgical reps, physicians and patients who reported negative comments directed at them by Dr. Kaul's competitors. The incident between Corey Johnson and Andrew

Kaufman in early 2013 at UMDNJ exemplifies the issue as do the defamatory comments made by Robert Heary to Fances Kuren in 2008 and Thomas Peterson to Linda Reyes in 2013. In March 2013 Judge Slomenski issued an arrest warrant for defendant, Heary, in the Kuren v Kaul matter, for his failure to comply with court orders. **( Exhibit 22 a + b )**

293. From March 2011-April 2012 Dr. Kaul's practice grew 300% and in April 2012, the same month the state filed the complaint, his corporations collected $1.2 million. His case volume had increased by 300% and the complexity of the cases he successfully performed grew as demonstrated by the video link in the attached document.

294. In the development of NJSR Surgical Center Dr. Kaul employed a large team of healthcare consultants, lawyers, developers and financiers to bring the project to completion. The stellar reputation that the surgical center developed was destroyed by the acts of the defendants, who conspired with the media to manipulate public opinion. The Bergen Record published stories that were defamatory, misleading and intended to destroy the reputation of Dr. Kaul and all entities associated with his name. It is of significance that the Borg Family, which owns The Bergen Record, have had their real estate interests facilitated in New Jersey and continue to act as a mouthpiece for Christie's 2016 campaign.

295. Dr.Kaul's reputation as an expert in minimally invasive spine surgery started to develop in 2003 when he was one of the first physicians in New Jersey to perform an endoscopic lumbar discectomy and it was this reputation that attracted many well respected physicians from around the world to spend time observing him in the operating room. Dr. Kaul proctured numerous courses on minimally invasive spine surgery and taught many other physicians-exhibit-

296. Dr.Kaul performed the first outpatient lumbar fusion in 2005, the first outpatient adolescent spondolysthesis correction in 2011 and the first outpatient three level degenerative scoliosis correction in 2011.

297. Dr.Kaul successfully performed thousands of interventional spine procedures for patients with debilitating chronic pain.

298. In early January 2012 two female inspectors from the state made an unannounced visit to the surgical center. Dr. Kaul asked them the purpose of their visit to which they dishonestly responded it was a routine visit. Their real intention, as became clear on April 2nd 2012, was to gather information about Dr.Kaul that would assist the Christie administration in the construction of its politically corrupt scheme directed at destroying Dr. Kaul's global reputation and business interests. Dr. Kaul

46

talked with Jeffrey Randolph, the attorney responsible for the legal compliance of the center, who then spoke with one of the investigators, Susan Sulgalski. Randolph did not advise Dr. Kaul and neither did he tell the investigators that they would need a subpoena before any further information was given to them. The two females arrived while Dr.Kaul was in the middle of a case and very bizarrely they asked Dr. Kaul if they could come in and watch. He denied their request to avoid violating patient privacy as protected under federal HIPPA regulations. Dr.Kaul also spoke with Joan Balducci, RN, the clinical consultant who oversaw the Medicare and AAAHC credentialing process. He used their business cards to communicate their titles to Joan. She was not however able to provide Dr. Kaul an explanation as to why they were at the center.

299. Dr. Kaul was misled by the dishonest state representatives but had his staff comply with their requests for the production of numerous patient files. The individuals arrived at the facility at approximately 1pm and departed at approximately 6pm. The intrusion signaled the commencement of an eighteen month period of Christie sponsored harassment that targeted all employees and individuals associated with Dr.Kaul and his corporations.

299. There were several subsequent phone calls between Dr. Kaul's staff and the two females regarding the submission of further files . Dr.Kaul discussed the matter with Randolph who failed to request a written explanation from the state, despite Dr.Kaul's recommendation, as to why they had sent their representatives to the surgical center.

300. From January to April 2012 the practice continued to grow with monthly billings of approximately $4million that provided clinical services at 30% of the cost that a hospital such as Meadowlands actually charged the insurance carriers. The owner, Dr.Richard Lipsky, gave money to Christie and has through the law firm of Brach Eichler been one of the largest contributors to New Jersey politicians. Judd Shaw, esq, one of the attorneys Dr.Kaul used to handle his PIP arbitration claims recounted a meeting he had with Lipsky and Brach Eicher attorney, Mark Mannigan, in approximately 2009 most likely to discuss a how the three of them could profit from the legal fees associated with arbitration awards. The specific detail that sticks in the mind of Dr. Kaul is when Shaw described the sycophantic manner in which Mannigan greeted Lipsky with a kiss. Lipsky and his hospital have been the subject of numerous health fraud allegations from both state and federal entities. Dr.Kaul's deposition on October 19th 2010 resulted in an award against insurance company, State Farm, for patient Ana Patel. The patient had successfully undergone minimally invasive spine surgery and the insurance carrier was forced to pay. Upon information and belief defendants Allstate and Geico conspired with State Farm to bribe defendant, Christie, to revoke Dr.Kaul's medical license They then used the revocation as an excuse to not pay the monies they owed Dr.Kaul, for clinical

services that had been deemed medically appropriate by National Arbitration Forum arbitrators. An elaborate racket. **( Exhibit 23 )**

301. On April 2nd 2012 Dr. Kaul received a phone call from Joseph Gorrell that the state had filed an action to revoke Dr. Kaul's license. The following day Dr. Kaul received the complaint which indicated that a hearing was scheduled for April 9th. Dr. Kaul instructed Gorrell to request more time to prepare the witnesses and the matter was rescheduled for May 9th.

302. Dr. Kaul dismissed Gorrell because of he believed his handling of the matter was incompetent and retained Robert Conroy who persuaded the NJBME to enter into a consent order that permitted Dr. Kaul to continue practicing.

303. The wrongdoings committed against the good global reputation of Dr.Kaul built over 33 years of international medical education caused the minimally invasive pioneer to publish hundreds of articles, books and short films. A biography of his life, Arjun Rising, was written by first time Australian author Angelique Papadelias in 2013 and is published on Amazon along with thirteen other books he wrote. Papadelias also wrote the screenplay for the film. Dr. Kaul also published approximately two hundred essays on social media platform, Linkedin, that covered issues ranging from the social injustices of prison to whether society should abolish politicians. In the middle of this humanities based directive were some articles on minimally invasive spine surgery. Dr. Kaul produced three hundred short films on YouTube about his professional and philanthropic work in addition to pieces on the Spine Turf Wars. He developed six websites and wrote hundreds of blog articles a number of which are published on peer reviewed website www.article.com . **( Exhibit 24 a + b )**

304. From March –June 2015 Dr.Kaul hosted a current affairs radio show with Gregory Riccardi on WVNJ called My Favorite Show. Twelve weekly episodes were produced.

305. The New Jersey attorney general, Doreen Hafner, believed the digital content Dr.Kaul produced relevant to her objection to his 2015 application for license reinstatement, as in her biased opinion, it demonstrated a lack of remorse.

306. Dr. Kaul filed an ethics complaint against Hafner in 2013, which he believed should have precluded her from any further involvement in his case, but which defendant Michael Keating oddly did not consider relevant. **( Exhibit 25 )**

307. The largest spine industry organization in the world, Becker's Spine and ASC, has covered Dr.Kaul's career since 2010 with numerous features on his pioneering spine work and the politics of his professional challenges.

308. Andrew Cuomo is the governor of New York State. He shares responsibility for the NY/NJ Port Authority with defendant Christie and in this context Dr. Kaul sent him a letter in 2016 to inform him of the complaint that had been filed with the ICC, which described the use of the Port Authority in the trafficking of chemical weapon precursors to Syrian rebel forces in 2013. **(Exhibit 26)**

309. David Samson, one of Christie's closest political allies and partner at the New Jersey law firm of Wolf Samson, was the chairman at the PA in 2013, which was also the time that Christie's staff closed three lanes into the GWB on September 9th. Samson was the NJ Attorney General who Dr.Kaul defeated in his 2003 hearing before the NJBME.

310. New York attorney Gerald DiCharia, represented Dr. Kaul in a 2010 domestic incident matter brought by his Persian Armenian ex-girlfriend Violet Safarian, whom Dr.Kaul met at the Mondrian Hotel in Los Angeles in 2006. . The matter was resolved with a disorderly conduct violation and $250 fine. During a conversation Dr.Kaul had with DiCharia in his Manhattan office in 2010 he stated that he was friendly with Cuomo. This detail was communicated in the context of a conversation about politics, law and medicine. The political proximity of DiCharia, Cuomo and Christie explains the reluctance that DiCharia demonstrated when Dr.Kaul requested his assistance in 2015 to file an application for a New York State medical license. This association, although not yet tested, has the potential to prevent Dr. Kaul from obtaining a medical license in New York. He intends, however, to submit an application in March 2016.

311. Daniel Arschack is a New York based human rights attorney who has also defended clients accused of war crimes in the International Criminal Court. Dr. Kaul met Arschack in 2006 through his friend and physician Timothy Reed, who had been accused by his girlfriend of possessing pornographic images of children on his computer. Dr. Kaul provided the $250,000 bail and assurances to get Reed out of jail. The matter commenced with the SVU unit of the NYPD, on which the TV series Law and Order is based, but was transferred to the United States District Court, The Southern District of New York. Preet Bharara was the US Attorney who prosecuted the case, which concluded in 2015 with the judge not sentencing Reed to jail. Dr. Kaul sent Bharara a letter in 2015 that requested his office investigate Christie for the federal crimes committed against Dr. Kaul when he was a New York citizen in 2012. Dr. Kaul had initially retained Arschack to defend his interests in the Violet Safarian matter but substituted him with DiCharia. Arschack has defended physicians before the New York State Medical Board in complex cases, and after the final resolution of Reed's

case in August 2015 Dr. Kaul asked Arschack if he would assist him in his application for a New York State medical license. Arschack did not believe he could help based on the immense amount of negative publicity that the Christie administration had engineered, and which Arschack believed had caused irreparable damage to Dr. Kaul's reputation. Dr. Kaul did not pursue the matter with Arschack but was returned the bail money.

312. Keith Behrens is a New Jersey based accountant who was introduced to Dr.Kaul by Mark Mannigan in 2003. Behrens prepared and filed Dr.Kaul's personal corporate tax returns for Interventional Pain Associates and Pompton Anesthesia Associates from 2003-2006. Sylvan Siboni replaced Behrens in 2006 who opined that Behrens had committed accounting negligence, by underpaying Dr. Kaul and overpaying the New Jersey Department of Treasury. Dr.Kaul met Siboni through dentist, Robert Federman whom Dr. Kaul had met through the now deceased owner of Market Street Surgical Center, John Quinn. Quinn died in 2015 while vacationing in Costa Rica with two chiropractor friends, Louis D'Agostino and Michael Manno, and had at the time of his death, been involved in extensive commercial litigation with Allstate. The cause of his death was never revealed to Dr.Kaul.

313. Fabian Bitan is a French orthopedic spine surgeon who is the Chief of Spine at Lennox Hill Hospital in Manhattan. Surgical device representative, Meryl Strommer, at the NASS meeting in 2006, introduced him to Dr.Kaul. Bitan wanted to acquire the skills of minimally invasive spine surgery and spent the next two years observing and then assisting Dr. Kaul with cases at the BPASC. In addition Dr.Kaul introduced him to many of his referral sources in order to help Bitan in the building of his New Jersey practice. In 2008 Bitan invited Dr.Kaul to lecture to the spine department at Lennox Hill on MISS techniques. Bitan was invited to the US in 2004 as a consequence of his immense experience with the artificial lumbar disc in France. The disc proved, however, to be fraught with clinical complications and has been almost abandoned as a surgical option. Bitan submitted an application for privileges at NJSR Surgical center in early 2012 but due to the acts committed by the defendants that destroyed Dr.Kaul's reputation he never joined the center. Bitan chose instead to join the surgical center owned by Dr. Kaixuah Liu, who had also spent time training with Dr. Kaul, and is today one of the most successful minimally invasive spine surgeons in the tri-state area. He still resides at his Fifth Avenue apartment in Manhattan and has not spoken to Dr. Kaul since 2012. Bitan although not a neurosurgeon is a member of NASS.

314. Ramesh Babu is an Indian-American neurosurgeon based at NYU medical center. He met Dr. Kaul in 2011 through a surgical sales representative and joined NJSR Surgical Center where he performed cases with Dr.Kaul. Babu initially agreed to assist Dr.Kaul in the defense of his case against the NJBME and had multiple communications with his attorney at the time, Joseph Gorrell. However

in May 2012 he decided he could not help. Babu is a member of both defendants NASS and CNS. Babu was taught how to perform a percutaneous lumbar interbody fusion by Dr.Kaul and upon information and belief continues to employ this technique in his current practice.

315. Christopher Collins is a registered nurse who was the director of nursing for the NJSR Surgical Center. Dr.Kaul employed him in early 2009 in anticipation that the center would open in late 2009. However due to the negligence of Nicholas Tsapteris, the architect/contractor, the project failed all town inspections and then Dr.Kaul assigned Collins the day to day task of overseeing the re-construction which was successfully achieved by Scott Verino, the Bronx based contractor who had built Dr.Kaul's Manhattan townhouse. Dr. Kaul chose not to give the project to local contactors due to the complexity of the construction. This may have played a role in the Republican Party led hostilities that Dr.Kaul experienced from the locals, both just before and decidedly after the unlawful suspension of his license. Collins worked closely with Dr.Kaul on the logistics of case scheduling once the center had opened and witnessed the high level of patient satisfaction. He collected clinical outcome data, which included a 0% infection rate in 2011 as compared to the 3-5% reported, by hospitals. One of the main drivers of elevated healthcare costs is post-operative infection, which occurs more frequently in hospitals due to spread between patients. Dr.Kaul was able to perform complex minimally invasive spine procedures on a same day basis, thus almost eliminating a patient's exposure to nosocomial pathogens.

316. Brian Cox is an individual who works in finance and met with Dr. Kaul in August 2012 to discuss the sale of the $45 million in AR owed to his corporations. Dr. Kaul paid for Cox's trip to New Jersey. Thomas D'Angelo introduced Dr.Kaul to Cox. He did not secure a sale and never returned the money for his flight from Chicago.

317. Susan Fanelli was a registered nurse practitioner who worked for Dr. Kaul in 2006. She was dismissed after seven months of employment because she was incompetent. Fanelli, a New Jersey divorced mother of four, would wear inappropriate and sexually provocative clothes to work which exposed her cleavage. During her employment with Dr. Kaul she underwent breast augmentation surgery, which she publically announced to his staff. Shortly after she had been terminated she filed a sexual harassment lawsuit against Dr.Kaul and her attorney contacted Dr.Kaul's ex-wife in an attempt to garner her support for the ill intended lawsuit. Dina Kaul wisely refused to get involved. Approximately three weeks after Fanelli had departed, Dr.Kaul received several faxes from local pharmacies, which indicated that Fanelli had stolen Dr. Kaul's prescription pad and forged his signature. Dr.Kaul filed a complaint with the nursing board and a few weeks later Fanelli's personal injury lawyer dropped the case.

318. Leslie Hoffman is a New York based writer and public relations consultant who worked with Kelley Blevins from February 2013-March 2014. During this period Hoffman had a discussion with a senior member of the New Jersey Republican Party regarding Dr. Kaul's case. She informed the individual that based upon her knowledge and understanding of the matter defendant Christie should return Dr.Kaul's license before things got worse.

319. Barnert Hoffman is a retired New Jersey Superior Court judge who rendered a written legal opinion in 2003 regarding the UK case. He stated that in his thirty-year career as a prosecutor, defense lawyer and judge he had never seen a conviction based on either the facts or law on which Dr. Kaul was convicted.

320. Jonathan Lewin is an orthopedic spine surgeon who was trained in 2007 by Dr. Kaul on how to perform outpatient minimally invasive spine fusions. He currently works at the Malo Institute in East Rutheford, New Jersey. After the unlawful suspension of Dr Kaul's license in April 2012 Lewin attempted to lure Daniel Goldberg, the individual that Dr.Kaul had trained in healthcare communications, to join his practice in Englewood. Goldberg refused. Lewin now routinely uses the technique he learnt from Dr. Kaul in his surgical practice.

## 1. COUNT ONE

### RACKETEERING-
### HOBBS ACT VIOLATION
### MAIL FRAUD
### WIRE FRAUD
### HONEST SERVICES ACT
### MONEY LAUNDERING

**(ACCUSED DEFENDENTS:CHRISTOPHER J.CHRISTIE, ESQ ; THE STATE OF NEW JEREY; JEFFREY CHIESA,ESQ; LEWIS STEIN,ESQ; HOWARD SOLOMON, ESQ; ALLSTATE NEW JERSEY INSURANCE COMPANY; RICHARD CRIST; GOVERNMENT EMPLOYEES INSURANCE CO; GEICO INDEMNITY; GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY;BERKSHIRE HATHAWAY: WARREN BUFFET: TD BANK; DIVESH KOTHARI; RUTGERS SCHOOL OF BIOMEDICAL AND HEALTH SCIENCES; JAMES GONZALEZ; ROBERT HEARY, MD; STEVEN LOMAZOW,MD; GREGORY**

PRZYBYLSKI,MD; FRANK MOORE, MD; PETER CARMEL,MD; WILLIAM MITCHELL,MD; PETER STAATS,MD; MARC COHEN,MD; THE LAW FIRM OF SCARINCI AND HOLLENBECK; KENNETH HOLLENBECK, ESQ; THE LAW FIRM OF BRACH EICHLER; JOSEPH GORRELL, ESQ; THE NORTH AMERICAN SPINE SOCIETY; THE AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS; THE CONGRESS OF NEUROLOGICAL SURGEONS; CHRISTOPHER WOLFA, MD; THE AMERICAN MEDICAL ASSOCIATION;THE LAW FIRM OF DUGHI HEWIT; MICHAEL KEATING; ANDREW KAUFMAN,MD; THE NEW JERSEY BOARD OF MEDICAL EXAMINERS; WILLIAM ROEDER; NORTH JERSEY MEDIA; LINDY WASHBURN; HACKENSACK UNIVERSITY MEDICAL CENTER (HUMC); ROBERT GARRET; ATLANTIC HEALTH SYSTEM; BRIAN GRAGNOLATI;THOMAS PETERSON, MD;)

321. The events that led to the filing of this complaint commenced in February 2005 when Dr. Kaul performed the first successful outpatient lumbar interbody fusion at the Market Street Surgical Center in Saddlebrook, New Jersey.

322. The case attracted significant attention from the neurosurgical defendants who operated their medical businesses in close geographical proximity to Dr.Kaul.

322. Information about his work was communicated through a network of surgical sales representativesand physicians that rotated through various outpatient surgical centers. During weekly conversations with reps, Robert McGann, Marcel Pouliot and Graig O'Brien, Dr. Kaul came to know the attention his practice was receiving and the hostile reaction it caused in his competitors.

323. The factual events that followed on from 2005 are organized below under subject headings with an internal chronological order:

### The Spine Surgery Field

324. Minimally invasive spine surgery is an emerging field with unclear parameters.

325. Minimally invasive surgical procedures used to be performed only by neurosurgeons.

326. In the past few decades, interventional pain physicians trained in anesthesiology, rather than neurosurgery, have expanded the scope of their interventional pain practice to include minimally invasive spinal surgeries.

53

327. According to a December 1998 Spine News article authored by Defendant Dr. Heary, the publication's editor, a fellowship in spinal surgery is "unnecessary for most graduating residents entering private practice."

328. The expansion of the scope of work that physicians like Dr. Kaul are now qualified to perform with proper training encroaches upon the practice area of neurosurgeons who, until recently, enjoyed a monopolistic hold over the minimally invasive surgical procedure market.

329. Consequently, several neurologists, including the Defendants named herein, have purposefully and intentionally attempted, through slanderous public statements and collusive pressure on legislatures and insurance companies to change billing codes in favor of neurologists, to exclude anesthesiologists from the spine surgery market, and to intimidate interventional pain practitioners from carrying out minimally invasive spinal surgeries and other related procedures.


**James Jarrell**

330. In October 2005 patient James Jarrell was referred by chiropractor John Ford to Dr. Kaul who performed a history and physical examination at Sussex County Total Health located in Newton New Jersey.

331. Based on the clinical and radiological findings the patient was recommended for provocative lumbar discography, which demonstrated degenerated discs at the L4-5 and L5-S1 levels.

332. The patient subsequently underwent a minimally invasive lumbar interbody fusion at the affected spinal segments.

333. Jarrell returned to his employment in construction two after the surgery.

334. In December 2005 Jarrell underwent a spinal manipulation with Ford and experienced severe pain immediately after the intervention, which caused him to make the statement:
"He broke my fusion"

335. Jarrell communicated this detail to Dr. Ford's receptionist, Denise, who in turn communicated it via telephone to Kelly Gay, the office manger for Dr. Kaul.

336. Ford immediately sent Jarrell to consult with Dr. Kaul who ordered a CT scan of the spine which indicated an extruded disc fragment at the L3-4 level.8. Based on the radiological findings Dr. Kaul recommended an endoscopic removal of the fragment.

337. However in January 2006 Jarrell underwent a questionably necessary revision surgery with neurosurgeon, Alfred Steinberger, which did not ameliorate his pain.

338. Jarrell, thorough his attorney Louis Stein filed a lawsuit in 2007 which culminated in a New Jersey Supreme Court ruling in 2015 that ruled against a claim made by Stein that physicians were obligated to inform patients about their medical malpractice coverage.

339. It is relevant that Alfred Steinberger, the expert who testified against Dr. Kaul in this matter, belongs to the same neurological group in which Frank Moore is a partner.

340. Moore is the individual that communicated to McGann a conversation he had with Cohen in which the latter stated " something big is coming down the pipe.

341. Moore was also named as  defendant in the Kaul v Heary lawsuit in which one of the allegations against the five defendant neurosurgeons was anti-trust violations.

342. Steinberger was oddly allowed by Judge Coburn to testify as an expert despite the fact that he had operated on Jarrell and notably failed to improve his condition and it would be fair to conclude thathis surgery failed.

343. The conflict of interest in allowing Steinberger to act as both expert and treating physician should have barred him from testifying in the matter.

344. The case was tried in Morristown despite the fact it had no jurisdictional basis. Morris County is Christie's' home base and the denial made of the application to move to the county in which the clinical services were provided was denied by Coburn.

345. The Jarrells lived in New York. Ford practiced in Sussex county while Dr. Kaul provided clinical services in Passaic, Bergen and Sussex counties. There were no legal or business ties to Morris County which was also where Stein was based.

346. Stein donated to Christie's 2009 gubernatorial campaign as did Coburn. Both incidentally belong

to the same synagogue as Cohen.

347. During a deposition in August 2012 at Stein's Succassana office, Dr. Kaul was asked the following question about the tenant in his Manhattan brownstone at 69 west 83rd street:" do you know what Boruch Freedman does for a living ? "which Dr. Kaul found to be a strange question, but to which he answered "No".

348. However Dr.Kaul later found out through his real estate broker, Gordon Sokich, that Freedman was an arms dealer and had rented the house specifically because of its sophisticated security system. Freedman's occupation as an arms dealer placed him at an increased security risk that the brownstone's system mitigated.


### Frances Kuren

349. In April 2007 patient Dr. Shams Qureshi referred Frances Kuren to Dr. Kaul for an evaluation of her spinal pain.

350. In 2006 orthopedic spine surgeon Dr. Erash Emami operated on Kuren but after the surgery the patient developed foot drop on the left side.

351. Dr. Qureshi performed a provocative lumbar discogram in March 2007 that indicated painful disc degeneration at the L3-4, L4-5 and L5-S1 levels.

352. In April 2007 Kuren was referred by Dr.Qureshi to Dr.Kaul and in July 2007 the patient underwent spinal revision surgery, which led to a marked improvement in her pain.

353. In September 2007 Kuren tripped at her residence and caused a fish tank to fall on her left leg, a fact she did not initially reveal to Dr.Kaul, but which was subsequently revealed in a letter sent to the New Jersey Medical Board by her friend Cheryl Schwartz. Kuren, most likely motivated by greed, made a statement to Schwartz that she intended to file a lawsuit and would in her words "make millions". The award for payment of clinical services made by DRP Lynch confirmed the medical necessity of the corrective spine surgery Dr.Kaul performed on Kuren. Kuren had consulted with Dr.Kaul after a failed surgery with orthopedic spine surgeon, Arash Emami. Emami testified for the defendant, State of New Jersey, in the OAL hearing. ( **Exhibit 27 a + b** )

354. To further this scheme she consulted with UMDNJ neurosurgeon Robert Heary, a local

56

competitor, who advised Kuren to also file a complaint against Dr.Kaul with the medical board, which she did in 2008. Dr.Kaul filed a complaint against Heary with the NJBME on November 16th 2015 **( Exhibit 28 )**

355. Heary recommended surgery that Kuren chose not to undergo.

356. A surveillance video of Kuren obtained in 2012 shows her performing manual tasks that she had previously, during her legal deposition, denied being able to do . The video also shows her smoking crack in a parking lot and ends with her being approached by a New Jersey state trooper. The video is posted on You Tube and entitled 'The dishonest patient"

357. In early 2009 Kuren through Morristown based personal injury attorney, John Hoyt, filed a lawsuit and on February 3rd 2010 Dr.Kaul had a meeting with the New Jersey Medical Board during which he discussed his education, training and the Kuren case. On the PEC on was Dr.Mahmood Cheema,an orthopedic surgeon at St. Barnabas Hospital, whose commericial interests were threatened by Dr.Kaul. Gorrell told Dr.Kaul that he had represented Cheema on a number of healthcare regulatory issues, which reinforces the message that attorney-client privilege is a myth in New Jersey. The other two physicians, Jordan and Stanley, were both dismissed by defendant Christie in 2014. Stanley is African-American and Jordan belongs to the Democrat Party. **( Exhibit 29  a + b + c + d )**

## **Christie + New Jersey Auto Insurance Industry + Spine + The Slaving Industry**

358. In 2005  the New jersey Department of Banking and Insurance (DOBI), under direction from the Auto Insurance Industry passed a law that enacted a fee schedule which significantly limited the reimbursement fees paid to physicians and outpatient surgical centers. The fee schedule specifically targeted interventional pain physicians.

359. Hospitals and neurosurgeons managed to remain exempt from this control most likely due to their aggressive lobbying activities in Trenton.

360. The case resulted in lengthy litigation in which the firm of Brach Eichler received almost $1 million in legal fees.

361. The matter was eventually ruled on by the New Jersey appellate court in 2009 who predictably

ruled in favor of the insurance industry.

362. The case before the appellate division was unsuccessfully argued by Joseph Gorrell who was widely criticized for his seemingly intentional ineffective advocacy.

363. New Jersey has the highest auto insurance rates in the country and the subsidiaries of companies such as Allstate and Geico generate annual profits in excess of $100 million. These entities, in contrast to their position in most other states, effectively control the government through generous political donations to both democrats and republicans.

364. All of the New Jersey insurance carriers are underwritten by Lloyd's of London which was built in the 1700's on the back of the slaving industry. In 2015 the Jamaican government filed a legal action against both the British government and Lloyd's demanding compensation for their intimate involvement in the transportation of slaves from West Africa to British owned plantations in the Caribbean. The action has yet to settled.

365. In August 2011 the insurance industry ordered the state government to enact a further set fees that reduced the reimbursement fees even further.

366. This occurred despite an increase in their annual profits with none of the savings passed onto New Jersey consumers. Annual insurance premiums in the state have risen by 300% over the last decade while actual industry profits have increased by 30% every year.

367. The 2011 fee schedule resulted in litigation from which the firm of Brach Eichler received almost $3 million in legal fees.11. In March 2011 Dr. Kaul opened the NJSR surgical center in Pompton Lakes and commenced performing minimally invasive outpatient lumbar spinal fusions.

368. The introduction of the fee schedule and the legislation, with which it was associated, was the reaction of the auto insurance industry to the work performed by Dr.Kaul. Their control of the state government and the ease with which they were able to corrupt Christie accounted for the almost uncontested manner in which the bill was passed. The New Jersey Supreme Court, which Christie was attempting to control, refused to  hear the matter and the bill became law.


### Christie + Mannigan +Lipsky + Allstate

369. Dr.Richard Lipsky retained Mark Mannigan at Brach Eichler to pay political lobbyists to support the 2011 bill to limit the performance of spine surgery to hospitals. This was also supported by the insurance industry which now included the major medical carriers in contrast to the bill passed in 2009. The anti-trust activity of new jersey hospitals mediated through their credentialing committees has caused damage to the availability of spine services to the public.

370. The committees are used by neurosurgeons and orthopedic spine surgeons to deny interventional pain physicians hospital privileges. The effect of this is to artificially reduce the overall number of physicians able to provide the service, which allows the neurosurgeons/orthopedic spine surgeons to raise their fees and hospitals to monopolize the market. This was the reason that Lipsky who bought Meadowlands Hospital in 2010 for only $16 million financially supported the bill and donated to Christie directly and through the law firm of Brach Eichler.

371. The New Jersey Auto and Health Insurance Industry strongly supported the bill as it would reduce the availability of spine services and therefore increase their corporate profits. The ultimate victims were, however, the citizens of New Jersey with spinal pain.

**Opiate epidemic + Christie + William Palatucci + Purdue Pharmamaceuticals**

370. The reduction in the aforementioned clinical services is one of the reasons for the opiate epidemic in the state of New Jersey. The inability of patients to receive spine care for their chronic pain explains the rise in opiate consumption which has been listed as the number one public health policy crisis by the center for disease control (CDC).Dr.Kaul experienced and understood the issues well when his patients were unable to find non-opiate spine care after the suspension of his license. Many of these chronic pain patients were forced to find relief through the purchase of street grade heroin which is one of the factors which explains the severity of the epidemic in New Jersey compared to other states.

371. New Jersey is home to the pharmaceutical industry in America and has made significant political donations to Christie. This explains why he chose not to prosecute their executives for the opiate epidemic, but instead had his attorney generals chase the easier target of physicians, with the majority of them being Indian.It is therefore reasonable to conclude that Christie is a significant contributor to the opiate epidemic and his political calls for more rehabilitation facilities are linked to the money he would make through kickbacks from the corporations that would use taxpayer money to develop the centers.

372. This is similar to the halfway house scandal that was reported in 2009 by Sam Dolnick at the New York times and which involved his political advisor, William Palatucci. The pattern of misconduct is the same and simply redirects humans from jails and halfway houses to rehabilitation institutions. Significantly the health insurers in new jersey do not pay for drug rehabilitation and so Christie's plans would not alienate one of his largest donors.Dr.Kaul had himself been a patient in 2002 at Sunrise House, a drug treatment center in Lafayette New Jersey and had paid $10,000 for a twenty-eight day program.

373. Oxycontin is manufactured by Purdue Pharmaceuticals, which was successfully sued in Kentucky by the attorney general, and has been identified as one of the causes for the recent surge in heroin abuse. Patients unable to procure spine care services turn initially to oxycontin and when unable to pay for the tablets that cost $1 for every milligram then turn to street grade heroin. The increase in gun violence in Newark and Camden is connected to the gang wars for control of heroin traffic.

## TD Bank

374. In March 2011 Dr.Kaul opened the NJSR Surgical Center in Pompton Lakes, New Jersey, a Medicare certified AAA accredited facility, which after one year of operating reported a 0% infection rate.

375. The funding for the construction of the surgical facility was provided by TD Bank and in May 2011 Dr.Kaul met in Lawrenceville,NJ, with regional manager, Terri McCoy, who despite there being no delinquencies made an odd request for repayment of the loan. As the attached letter dated September 2013 to TD President, Bharat Masrani, indicates the only reasonable explanation was that the Christie administration had ordered the bank to apply financial pressure to Dr.Kaul. The letter also details a meeting in June at the Newark offices of TD's attorneys, Meyner Landis, during which one of their lawyers, William Fiore, in response to Dr.Kaul indicating he had financial obligations to the IRS, stated:" I don't give a fuck about the IRS".In the room at the time were accountant, Robert Zelitsky, financial consultant, Thomas Diangelo and a TD Bank representative. **( Exhibit 30 )**

376. Subsequent to the meeting multiple emails and telephone calls were made by Dr.Kaul's administrative assistant, Kelly Gay, to the bank requesting that a loan repayment plan be instituted. Despite numerous requests TD Bank ignored her, but Dr.Kaul instructed her to make regular payments to indicate his willingness to cooperate with the bank and pay down the loan.